STATE OF NEW JERSEY, Petitioner,

v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, Respondent.

No. 80–2438.

United States Court of Appeals,
Third Circuit.

Argued Oct. 29, 1981.

Decided Feb. 5, 1982.

James R. Zazzali, Atty. Gen. of N. J., Trenton, N. J., for petitioner; Erminie L. Conley, Asst. Atty. Gen., of counsel; Andrea M. Silkowitz, Deputy Atty. Gen., Trenton, N. J., (argued), on brief.

Amy Yourman, Office of the General Counsel, Dept. of Health and Human Services, Washington, D.C., Nancy M. P. King (argued), Office of the General Counsel, Dept. of Health and Human Services, Baltimore, Md., for respondent.

Before ADAMS, ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The State of New Jersey petitions from a decision of the Grant Appeals Board of the Department of Health and Human Services (HHS) which denied federal reimbursement under the Medicaid program for medical services provided by the State over a two-year period to certain aged, institutionalized individuals. New Jersey contends that the Board erred in four respects: first, by concluding that the State's Medicaid plan in effect for the period in question did not cover the individuals with respect to whom New Jersey seeks reimbursement; second, by holding that HHS was not estopped from insisting on the disallowance by reason of allegedly inaccurate and misleading advice Department officials furnished to the State; third, by refusing to allow the State to revise its Medicaid plan retroactively in order thereby to become eligible for federal assistance; and fourth, by mis-

calculating the amount of the disallowance ultimately imposed. After determining that we have jurisdiction under 42 U.S.C. § 1316(a) to entertain this appeal, we reject each of the contentions advanced by New Jersey and deny the petition for review.

## I

### A

Title XIX of the Social Security Act, 42 U.S.C. § 1396, provides for the appropriation of federal monies to enable each state, "as far as practicable under the conditions in such State," to furnish medical assistance and rehabilitation services to certain individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. A state is not obliged to participate in what is commonly referred to as the "Medicaid" program. If it chooses to do so, however, it must submit to and have approved by the Secretary of HHS[1] a "State plan" that satisfies various statutory and regulatory requirements. *Id.* at § 1396a(a) & (b). Once such a plan has been approved and

takes effect, a state is entitled to federal grants representing reimbursement for a portion of the expenditures it incurs in providing specified medical services to eligible persons under the plan. *Id.* at § 1396b; *see* 45 C.F.R. § 201.5. No reimbursement is available for any amounts paid by a state to or on behalf of any "ineligible individuals." 42 C.F.R. § 447.59(b).

At the time New Jersey entered the Medicaid program,[2] Title XIX required, among other things, that a state plan extend medical assistance to all "categorically needy" individuals—that is, to "all individuals receiving aid or assistance" under any of a number of that state's income-assistance programs, such as the Old Age Assistance program.[3] In addition, a state, at its option, could also provide Medicaid coverage to those persons referred to as "medically needy"—that is, to individuals who had "income and resources" in excess of the various eligibility ceilings for any of the public-assistance programs, but insufficient to meet "the costs of necessary medical or remedial care and services."[4] Under the

---

1. Many of the programs administered by the former Department of Health, Education, and Welfare (HEW), including Medicaid, were transferred in 1979 to the newly-established Department of Health and Human Services (HHS). This opinion will refer in all instances to HHS, even though many of the events discussed herein occurred while HEW was still in existence.

2. New Jersey's Medicaid plan took effect on January 1, 1970, after several years of planning. The expenditures for which the State seeks reimbursement cover the period from July 1, 1971, through September 30, 1973. Consequently, the success or failure of New Jersey's reimbursement claim depends, to a large extent, on the interpretation of statutes and regulations in effect for the period *prior* to 1974. A number of these statutes and regulations have been amended at some point after the events occurred with which this opinion is concerned. For example, Titles I, X, XIV, and XVI of the Social Security Act, mentioned in note 3 *infra*, were replaced in 1974 by the Supplemental Security Income program, Pub. L.No. 92–603, 86 Stat. 1465 (1972), *codified at* 42 U.S.C. §§ 1381–1385. For the reader's convenience, reference will be made to the current version of Title XIX whenever possible, but no attempt will be made to discuss or explain this version.

3. In relevant part, § 1902 of the Social Security Act, 42 U.S.C. § 1396a(a)(10) (1970 version) (current version at 42 U.S.C. § 1396a(a)(10)(A)) required that a state plan provide for making medical assistance available to all individuals receiving aid or assistance under State plans approved under titles I [Old Age Assistance], X [Aid to the Blind], XIV [Aid to the Permanently and Totally Disabled], and XVI [Supplemental Security Income for the Aged, Blind, or Disabled], and part A of title IV [Aid to Families with Dependent Children].

4. [I]f medical or remedial care and services are included for any group of individuals who are not receiving aid or assistance under any [state plan, such as Title I, X, XIV, XVI, or IV–A] and who do not meet the income and resources requirements of the one of such State plans which is appropriate, as determined in accordance with standards prescribed by the Secretary, [the state Medicaid plan must] provide (i) for making medical or remedial care and services available to all individuals who would, if needy, be eligible for aid or assistance under any such State plan and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical or remedial care and services. . . .

terms of the statute, if a state elected to create a "medically needy" program, it was obligated to extend coverage to "*all* medically needy groups that correspond to the covered categorically needy groups," 45 C.F.R. § 248.10(b)(5) (1976 ed.) (emphasis added) (current version at 42 C.F.R. §§ 435.300–.325). Thus, for example, a state that provided Medicaid assistance to "categorically needy" persons participating in the Old Age Assistance and the Aid to the Blind programs could not include in its plan the "medically needy" aged without simultaneously including any "medically needy" blind persons with similar financial and non-financial characteristics. 42 U.S.C. § 1396a(a)(10)(B) (1970 version) (current version at 42 U.S.C. § 1396a(a)(10)(C)).

Pursuant to regulations that accompanied Title XIX, a state was empowered to include within its Medicaid plan certain individuals, not classifiable as either "categorically needy" or "medically needy" in their own right, who nonetheless qualified for coverage because they were members of one of six so-called "optional categorical groups." *See* 45 C.F.R. § 248.10(b)(2) (1976 ed.) (current version at 42 C.F.R. §§ 435.-200–.231).[5] For purposes of this appeal, only one such "optional categorical group" need be mentioned. Medicaid reimbursement could be obtained, if a state so desired, for medical services provided to

> [p]ersons in a medical or intermediate care facility who, if they left such facility would be eligible for financial assistance under another of the State's approved plans. This includes persons who have enough income to meet their personal

needs while in the facility, but not enough to meet their needs outside the facility according to the appropriate State plan. . . .

45 C.F.R. § 248.10(b)(2)(ii) (1976 ed.) (current version at 42 C.F.R. § 435.211).

## B

With this general statutory and regulatory background in mind, we proceed to discuss the facts involved in this particular appeal. Before it joined the Medicaid program, New Jersey provided benefits through a state-administered Medical Assistance for the Aged (MAA) program to elderly residents who lacked sufficient means to obtain necessary medical services. *See* 44 N.J.Stat.Ann. §§ 7–76 *et seq.* (West). New Jersey included in the MAA arrangement certain elderly persons who had income and resources in excess of the OAA eligibility limits.[6] The present controversy involves the status of this group of individuals—persons ineligible for OAA who nonetheless participated in the State's MAA program—under the New Jersey Medicaid scheme that became effective in January 1970.

The Medicaid plan ultimately adopted by New Jersey and approved by the Secretary of HHS did not purport to provide Medicaid coverage for all individuals who previously had been receiving MAA assistance. Former MAA recipients who qualified for federal OAA payments were, of course, incorporated into the State's plan by reason of being "categorically needy," *see* 42 U.S.C. § 1396a(a)(10) (1970 version) (current version at 42 U.S.C. § 1396a(a)(10)(A)). Those

---

42 U.S.C. § 1396a(a)(10)(B) (1970 version) (current version at 42 U.S.C. § 1396a(a)(10)(C)).

**5.** Individuals eligible under these optional coverage provisions were treated, for Medicaid purposes, as "categorically needy." *See* 42 C.F.R. § 435.1(b)(2) (describing the conditions for Medicaid eligibility that existed prior to the 1972 amendments to the Social Security Act (*see* note 2 *supra*)).

**6.** Regulations established by the Commissioner of the Department of Institutions and Agencies provided that

individuals 65 years of age, financially ineligible for OAA benefits but whose income was between $150 and $500 [per month], would qualify for reimbursement under the MAA program for hospital and home health care. . . . Single persons whose monthly income did not exceed $410 would also qualify for assistance for nursing home care. . . . Married couples whose monthly income was between $250 and $600 would qualify for hospital and home health care benefits and if between $250 and $650, for nursing home assistance. . . .

Brief for Petitioner at 2 (citations omitted).

members of the MAA population with income and resources in excess of OAA standards, however, were intentionally excluded from Medicaid coverage by the State. Apparently, New Jersey officials believed, for reasons discussed in Part III(B) of this opinion, that if such individuals were included within its Title XIX plan, then the State would be obligated to extend Medicaid benefits to *all* similarly-situated "medically needy" individuals financially disqualified from categorical-assistance programs.[7] Rather than enact such an extensive and far-reaching "medically needy" program,[8] New Jersey decided to forego any attempt to bring OAA-ineligible MAA recipients *within the scope of its Medicaid plan, and instead chose to continue to provide medical assistance to such persons at its own expense. Grant Appeals Board Decision No. 115 (Aug. 8, 1980), Appendix at 3a.

Aside from covering "categorically needy" persons, though, New Jersey extended Medicaid assistance to members of the "optional categorical group" defined by Regulation 248.10(b)(2)(ii), *supra*, that is, to those individuals who had "enough income to meet their personal needs" as long as they remained within a medical or intermediate care facility, but who would have qualified for some sort of categorical assistance, such as OAA, had they left the institution. In connection with this aspect of New Jersey's program, during the period from January 1, 1970, through June 30, 1971, the financial standard employed by the State in determining eligibility for its categorical assistance programs took into account the applicant's "special needs." As explained by the Grant Appeals Board, individuals with "incomes in excess of the basic monthly standard of need . . . could [nonetheless] be eligible for public assistance benefits if their income were below the finan-

cial limit augmented to include . . . special circumstance items . . . essential for the physical health and safety of persons in specified situations." Grant Appeals Board Decision, *supra*, Appendix at 4a. One such "special circumstance item" authorized a non-institutionalized OAA client to receive a cash or vendor payment for "homemaker services." *See* New Jersey Categorical Assistance Budget Manual § 315.1; Record at 212. Effective July 1, 1971, however, New Jersey amended its Medicaid plan by eliminating the "special needs" arrangement and, therefore, the homemaker cash payment. Instead, from that date until September 30, 1973, the State admeasured eligibility for OAA aid by means of a "flat grant" test. Under this latter approach, "[t]he income standard against which institutionalized individuals' incomes were to be compared for purposes of establishing Medicaid eligibility [under Regulation 248.-10(b)(2)(ii)] was a set monetary level that remained constant irrespective of any special needs that an individual might have if he were residing in the community." Grant Appeals Board Decision, *supra*, Appendix at 4a.

In the fall of 1973, administrators in New Jersey's Division of Medical Assistance and Health Services learned, apparently as the result of discussions with Medicaid officials from other states, that many of the OAA-ineligible persons who formerly had been receiving MAA benefits could in fact have been brought within New Jersey's Medicaid arrangement, even without the State's adoption of a comprehensive "medically needy" program. This desired result could be achieved, New Jersey discovered, by extending Medicaid coverage to the "optional categorical group" set forth in Regulation 248.10(b)(2)(ii) and by defining the eligibili-

---

7. Specifically, New Jersey asserts that its officials were of the opinion that, were the State to extend Medicaid coverage to the entire MAA population, it would be compelled to sweep within its Medicaid program "all other individuals financially disqualified for the OAA categorical assistance program, as well as [those disqualified from] the State's other categorical assistance programs, [*viz*] Aid to Families with

Dependent Children (Title IV–A), Aid to the Blind (Title X) and Aid to the Permanently and Totally Disabled (Title XIV)." Brief for Petitioner at 5.

8. Indeed, New Jersey *still* does not include the "medically needy" within its Medicaid program. *See* Record at 188; Brief for Respondent at 6.

ty standard for OAA aid to include "special needs" such as homemaker services. Under such a configuration, elderly institutionalized individuals who did not receive OAA could nonetheless be covered under Medicaid because: (1) if those individuals were to leave their institutions, they would be unable to afford necessary homemaker services; (2) such individuals would thus be unable "to meet their needs outside the facility"; (3) consequently, they would qualify for OAA payments "according to the appropriate State plan," *viz.*, a Title I plan with a "special needs" standard of eligibility; and (4) they could then be covered under Medicaid as members of the "optional categorical group" defined by Regulation 248.10(b)(2)(ii).

Effective October 1, 1973, New Jersey amended its Medicaid plan to incorporate the above-described arrangement. That is, the State replaced its "flat grant" method of determining OAA eligibility with a "special needs" standard that took into account the cost of homemaker services. The result of this amendment was that "virtually all" of those institutionalized individuals to whom New Jersey had provided MAA benefits at its own expense from January 1970 to October 1973 became eligible for federally funded Medicaid assistance. Letter from G. Riti, Acting Director, Division of Public Welfare, N.J. Department of Institutions and Agencies (Nov. 13, 1973), Appendix at 58a–59a.

In February 1974, New Jersey filed with HHS a retroactive claim for reimbursement of $14.8 million under the Medicaid program for medical services provided, at the State's expense, from January 1970 to Octo-

ber 1973, to OAA-ineligible MAA recipients. In May 1975, the agency's Regional Commissioner denied New Jersey's claim on the ground that the individuals with respect to whom New Jersey sought federal financial assistance had not been covered under the various State Medicaid plans in effect prior to October 1973. In November 1978, the portion of the Regional Commissioner's decision covering the July 1971 to October 1973 period, when New Jersey used a "flat grant" Title I calculation scheme, was upheld by the Administrator of the Department's Health Care Financing Administration. At the same time, however, the Administrator ruled that the State—assuming proper documentation was forthcoming[9] —could receive reimbursement for that fraction of the $14.8 million disallowance relating to the January 1970 to July 1971 period. The Administrator reasoned that during these initial months, New Jersey's Medicaid plan in fact contained the two elements necessary to trigger Medicaid coverage for institutionalized MAA recipients, namely, Regulation 248.10(b)(2)(ii) and a "special needs" provision in the OAA program. Letter from L. Schaeffer, Administrator, HCFA (Nov. 22, 1978), Appendix at 12a–19a. After further administrative proceedings not relevant to this appeal, at which State officials furnished the documentation discussed in note 9, *supra*, New Jersey was given credit for disallowances entered for the January 1, 1970, to June 30, 1971, interval.[10]

New Jersey appealed the Administrator's affirmance of the July 1, 1971, to September 30, 1973, disallowance to the HHS

---

**9.** The Administrator concluded that, on the basis of the evidence before him, he could not be sure that the State was requesting reimbursement only with respect to individuals who qualified under the "special needs" formula, and only for services provided by long-term care facilities that met federal standards for Medicaid provider participation. He suggested that New Jersey submit a revised claim that incorporated such documentation. Letter from L. Schaeffer, Administrator, HCFA (Nov. 22, 1978), Appendix at 17a–18a.

**10.** New Jersey initially sought Medicaid reimbursement totaling $14,842,373. This amount was later modified to include an additional $139,317, for a total of $14,981,690. *See* Letter from A. Klein, Commissioner, New Jersey Department of Human Services (Mar. 27, 1980), Record at 451–53. The State subsequently received notification that it would be credited for $2,839,238 with respect to the January 1970 to July 1971 period. *See* Brief for Respondent at 14 n.5. Thus, the remaining disallowance assessed against New Jersey totals $12,142,452. It is this latter sum that is at issue in the present appeal.

Grant Appeals Board. After concluding that a full-scale evidentiary hearing was unnecessary, because there was no genuine dispute between the parties as to the facts, the Board resolved all contested legal issues in favor of HHS and upheld the agency's disallowance determination. Grant Appeals Board Decision, *supra*, Appendix at 2a–11a. Shortly thereafter, New Jersey filed a petition for review with this Court, asserting that jurisdiction existed under 42 U.S.C. § 1316(a), and asking that the decision of the Board be reversed.

## II

■ Before addressing the merits, we must determine whether this Court is authorized under the relevant statutes to entertain New Jersey's petition for review of the Grant Appeals Board order. HHS urges that this appeal be dismissed for want of initial appellate-level jurisdiction. In addition, the Department contends that in any event the State has failed to exhaust all available administrative remedies. Both the jurisdictional and the exhaustion arguments advanced here by HHS were considered at length and ultimately rejected by this Court in a recent decision involving these same two parties, *State of New Jersey v. Department of Health and Human Services,* 670 F.2d 1262 (3d Cir. 1981). We conclude, consistent with the reasoning and the holding of *State of New Jersey,* that the controversy at bar is justiciable by this Court at the present time.

### A

The relevant provisions of the Social Security Act establish two distinct procedures for judicial review of final determinations by the Secretary of HHS. Any state dissatisfied with the Secretary's refusal to approve its Title XIX plan, or an amendment thereto, is authorized to bring an immediate appeal to "the United States court of appeals for the circuit in which such State is located." 42 U.S.C. §§ 1316(a) & (b). Direct review by a court of appeals also is available whenever the Secretary concludes, "after reasonable notice and opportunity for hearing," that a state's Medicaid plan, either on its face or in its administration, "has been so changed that it no longer complies with" applicable federal statutes and regulations. *Id.* at § 1396c. Where the Secretary makes no finding with respect to plan-disapproval or plan-nonconformity, but instead simply "disallows" a state's request for reimbursement of "any item or class of items" deemed by the Secretary not to be eligible for federal financial participation under the Act, a petition addressed to a court of appeals would appear not to be in order. Rather, in such a situation, an aggrieved state's proper recourse, according to HHS, is first to request administrative reconsideration of the disallowance, *id.* at § 1316(d), and then to seek judicial review in a federal district court.[11] *See State of New Jersey, supra,* at 1268–1271.

In view of our recent decision in *State of New Jersey,* it is unnecessary once again to discuss in detail the meaning, applicability, and interrelationship of section 1316(a) plan-conformity review and section 1316(d) disallowance review. For present purposes, it is sufficient to note that in *State of New Jersey,* this Court refused, when considering the section 1316 jurisdictional question, to be bound by the label that the Secretary attached to the agency's administrative activity. That is, we declined

---

11. It is an open question, at least in this circuit, whether a disallowance entered by the Secretary after reconsideration under 42 U.S.C. § 1316(d) is reviewable by a district court or, for that matter, by any other court. *See State of New Jersey, supra,* at 1270–1271. While HHS in past instances contended that § 1316(d) orders should be immune from judicial scrutiny, *see County of Alameda v. Weinberger,* 520 F.2d 344, 347–49 (9th Cir. 1975) (rejecting such a contention), the Department has abandoned this position. *State of New Jersey, supra,* at 1271 & n.8. In the present matter, for example, HHS has represented that "[i]f this Court determines to dismiss [this action] for lack of jurisdiction, there is no barrier to review in the district court of the Secretary's final disallowance determination . . . [T]he Secretary will not challenge the jurisdiction of the district courts to review disallowance determinations." Posthearing Submission for Respondent at 1.

to adopt an approach which would permit the Secretary to foreclose judicial review under section 1316(a) in situations where one administrative route is pursued when another would be more appropriate. HHS, for example, should not be entitled to categorize as a "disallowance" what, in essence, amounts to a determination that a state's ... program does not conform to a federally mandated requirement .... [I]n deciding whether section 1316(a) or section 1316(d) procedures are applicable, a court of appeals is obligated ... to conduct an independent evaluation of the underlying substance of the dispute.

At 1272.

Instructed by *State of New Jersey*, we consider the facts of the present matter as they relate to the jurisdictional issue. We believe that the differences between HHS and New Jersey "raise difficult and significant legal issues," *id.* at 1273, having to do with the coverage of certain individuals under the Medicaid program, the estoppel of a federal agency for its allegedly misleading advice to state officials, and the ability of a state retroactively to alter provisions of its Social Security plan so as to maximize its receipt of federal dollars. To be sure, the Secretary in this instance has not explicitly rejected New Jersey's Medicaid plan or an amendment thereto, determined that the State's approved plan is being improperly administered, or threatened to terminate all future Medicaid payments to the State. Nonetheless, recognizing that "the present problem does not fall neatly under either [the disallowance or plan-conformity] category," *Solomon v. Califano*, 464 F.Supp. 1203, 1208 (D.Md.1979), we conclude that "[t]he administrative determination about which New Jersey complains would appear to resemble more a finding of overall noncompliance with federal requirements," reviewable under section 1316(a), than "a technical, audit-connected shortcoming," appropriate for resolution under section 1316(d). *State of New Jersey, supra*, at 1275.

In arriving at this conclusion, we are guided by the opinion of the Court of Appeals for the Fifth Circuit in a case with a factual background strikingly similar to that of the present appeal. In *Texas Department of Public Welfare*, 556 F.2d 326 (5th Cir. 1977), *cert. denied*, 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978), HHS defended its decision to "disallow" $92 million in Social Security claims submitted by Texas on the grounds that some of the expenditures for which the State sought reimbursement were "not covered or purchasable under an approved State Plan," while others were requested for a fiscal year during which "State ... plans were not in operation with respect to the claimed expenditures." *Id.* at 331. Judge Ainsworth, writing for a unanimous panel, rejected HHS' contention that, because the Department had chosen to classify the reimbursement-denials as "disallowances," the judicial review provisions of section 1316(d) were applicable. Instead, he concluded, jurisdiction at the court of appeals level existed because the case in essence involved "attempts by Texas DPW to make material changes in the operation of [its] public service plan." As such, the State was entitled to receive the same administrative and judicial treatment as would be accorded a state that desired to amend its Social Security plan in a more straightforward (*i.e.*, a non-retroactive) manner: the plan-conformity procedures set forth in section 1316(a). *See* 42 U.S.C. § 1316(b). Only these procedures would ensure that Texas' "substantial" claim was not treated "in a summary manner" by HHS officials. 556 F.2d at 331–32.

Here, as in *Texas Department of Public Welfare*, the agency's "disallowance" was premised on a determination that the expenditures claimed by New Jersey were not "covered" under the state Medicaid plan then in effect. Here, as in *Texas Department of Public Welfare*, HHS rejected an effort by the State retroactively to amend that plan to receive federal assistance for services provided during an earlier fiscal year to persons with respect to whom the plan was "not in operation." Consequently, here, as in *Texas Department of Public Welfare*, we believe that "the purposes of

the Act and the equities are best served by treating this [matter] as a plan-conformity dispute under section 1316(a)," 556 F.2d at 330. *See also State of New Jersey, supra,* at 1273–1275; *Solomon v. Califano, supra,* 464 F.Supp. at 1208.

■ In this connection, we decline to accept HHS' claim that "[t]he case at hand involves a typical disallowance." Memorandum in Support of Respondent's Motion to Dismiss at 14. The "disallowance"-type precedents relied on by the Department, in our view, simply are not apposite.[12] Similarly, we cannot agree with the agency's assertion that the question presented for review here arose as the result of "an isolated and highly focused inquiry" in the course of "[a] simple audit review." *Id.* at 14, 18. On the contrary, as New Jersey points out, both the complicated legal nature and procedural history of this dispute, discussed earlier, tend to belie any such argument. We also disagree with the Department's suggestion that New Jersey's request for a hearing under 45 C.F.R. § 16.8(b)(2), which provides an opportunity for a party challenging a disallowance to present oral testimony to the Grant Appeals Board, constitutes an admission that, throughout the course of the administrative proceedings below, the State believed that a disallowance-type problem, as opposed to a plan-conformity issue, was involved. *See* Brief for Respondent at 18–20. This argument is unconvincing. From the outset of the controversy, the Secretary advised the State that the denial would be treated as a disallowance, a full opportunity for an on-record proceeding was provided before the Board anyway, and the State never acknowledged or endorsed the Secretary's characterization of the dispute as a disallowance.

Finally, we are not dissuaded from our conclusion that section 1316(a) procedures are appropriate for this matter by HHS' claim that, given such an outcome, "there would be no cases in which a disallowance of federal reimbursement under the Medicaid program could not be treated as a [plan]-compliance issue." Memorandum in Support of Respondent's Motion to Dismiss at 18. As we stressed in *State of New Jersey*:

> [We do not] wish to imply that any administrative disallowance can be reviewed directly in this Court as long as the protesting state asserts that the disallowance "really" raises compliance-related questions. We do not, after all, resort to such legal legerdemain in this case. Rather, we have independently reviewed the substance of the particular dispute involved here, and have concluded that the question of plan conformity lies at the heart of the claims of which New Jersey seeks review. It is precisely for this reason that § 1316(a) review can be justified.

At 1277 n.12. In sum, we hold that a court of appeals has jurisdiction under 42 U.S.C. § 1316(a) to consider, in the first instance, plan conformity-related determinations of the Grant Appeals Board of the type presented here for review by New Jersey.

**B**

■ As it did in *State of New Jersey*, HHS argues here that "by bringing this appeal now rather than insisting that a plan-conformity hearing be held pursuant

---

12. The dispute here between New Jersey and the Department cannot be traced to a mere "clerical" problem, such as the overpayment of physicians held to be appropriate for section 1316(d) resolution in *State of Georgia, Department of Human Resources v. Califano,* 446 F.Supp. 404 (N.D.Ga.1977). Nor does this case concern only a discrete aspect of the State's Social Security plan, as in *Wingate v. Harris,* 501 F.Supp. 58, 63 (S.D.N.Y.1980) (dispute involves only three decertified nursing homes, "not 'plan conformity'") or *State of Washington, Department of Social and Health Services v. Schweiker,* No. 81–7414 (9th Cir. Sept. 29, 1981). Similarly, the crux of the present controversy has nothing to do with the "accuracy of an audit," *see Medical Services Administration v. United States,* 590 F.2d 135 (5th Cir. 1979). Finally, the facts of this appeal are not comparable with those present in *County of Alameda, supra* note 11 ("disallowance" where state requested reimbursement using erroneous formula). For a more thorough consideration of these cases, see *State of New Jersey, supra,* at 1274–1275.

to 42 U.S.C. § 1316(a)(2), New Jersey has failed to exhaust its administrative remedies." *State of New Jersey, supra,* at 1277. According to the Department, such a failure in the present case is fatal, inasmuch as the absence of a compliance hearing means that "there are no findings of fact by the Secretary which this Court can review." Brief for Respondent at 18.[13]

We disagree, primarily for the reasons we identified in *State of New Jersey.* In that decision, we noted that "[o]ur Court has recognized that, '[a]s a judicially created doctrine, the requirement of exhaustion has traditionally been waived' in those situations where 'exhaustion [would be] futile.' " *State of New Jersey, supra,* at 1277, quoting *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 245 (3d Cir. 1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981). Applying this principle, we concluded that forcing the State to return to HHS for further administrative proceedings would indeed be "futile," given that there existed "no factual dispute between the parties that might be resolved by additional testimony or hearings," that "nothing in the record . . . even remotely indicates that the Secretary might adopt any other position were the case to be remanded for a compliance hearing," and that "none of the general justifications of the exhaustion doctrine . . . appears relevant in the situation at bar." *State of New Jersey, supra,* at 1277–1278.

The posture of the present appeal, we believe, is virtually identical with that in *State of New Jersey* with respect to the futility-of-exhaustion question. The Grant Appeals Board specifically found that "[t]here does not appear to be a genuine dispute as to the factual content of evidentiary material submitted for consideration"

by the parties, that the only "disagreement" was "as to the import of the information and the conclusions to be drawn therefrom," and that therefore "there [was] no need for" the evidentiary hearing requested by the State pursuant to 45 C.F.R. § 16.8(b)(2). Grant Appeals Board Decision, *supra,* Appendix at 5a–6a. In view of these declarations on the part of the Board, we are not persuaded by HHS' aforementioned argument that this appeal should be dismissed because "there are no findings of fact by the Secretary." We believe, moreover, that sufficient opportunity has been afforded both parties over a period of years to advance their legal contentions and accompanying documentation. Paraphrasing *State of New Jersey,* there is nothing in the record that "even remotely indicates" that the Secretary or the State might introduce any additional evidence or adopt any other legal position "were the case to be remanded for a compliance hearing." Were we convinced that a decision on the merits here would "premature[ly] interfere[ ] with agency processes," hinder the exercise of administrative "experience and expertise," or prevent the "compil[ation of] a record which is adequate for judicial review," *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975), we of course would be bound to return this matter to HHS for further proceedings. We are unable to reach any such conclusions, however. Furthermore,

> [a]s a practical matter, given the uncertainty that accompanies any attempt to administer a statute or regulation under attack in the courts, and given the amount of money involved, it should be in the interest of HHS, no less than in the interest of New Jersey, to have the present controversy resolved with all due haste.

13. In a related argument, the Department contends that a plan-conformity hearing, described by 42 U.S.C. § 1316(a)(2) and 45 C.F.R. §§ 213.1-.33, is a necessary predicate for direct appellate-level review, and that the present appeal should therefore be remanded so that such a hearing can be conducted. We cannot agree. We find nothing in the Act or its legislative history that precludes our treating the Grant Appeals Board's action on behalf of the Secretary in this dispute as a "final determination" rendered after an "opportunity for hearing" sufficient to satisfy the requirements of 42 U.S.C. § 1396c and thereby vest jurisdiction in this Court under 42 U.S.C. § 1316(a)(3).

*State of New Jersey, supra,* at 1276–1277. We therefore hold that New Jersey's "failure" to exhaust available administrative remedies, if indeed the State's action can be characterized as such, does not constitute a bar to our review of the merits of this appeal.

### III

Having ascertained that New Jersey's petition for review defines a justiciable controversy, we proceed to consider the merits of this dispute. New Jersey contends that the Grant Appeals Board erred in four respects. For the reasons that follow, we find each of the State's arguments wanting.

### A

New Jersey claims that the MAA individuals to whom it provided medical services at its own expense during July 1971 to October 1973 actually were covered by the State's Medicaid plan then in effect. The State's argument proceeds along these lines: (1) From January 1970 to July 1971, New Jersey's OAA plan contained a "special needs" provision. As a result of the interplay of this provision and Regulation 248.10(b)(2)(ii), *supra,* institutionalized MAA recipients who did not receive OAA cash payments were nonetheless eligible for Medicaid on the theory that, were such individuals to leave their institutions, they would receive OAA assistance so that they might purchase "special needs" such as homemaker services. (2) Effective July 1971, New Jersey replaced the "special needs" provision with a "flat grant" standard for determining OAA eligibility. The only practical consequence of this change was that members of the MAA population who left their institutions would no longer receive direct OAA payments in order to purchase homemaker services. Rather, such services were obtained indirectly; *i.e.,*

homemaker services initially were contracted for by local welfare agencies, and then were made available to eligible individuals upon their request.[14] (3) Because "the assistance for which the MAA population would have been eligible during the two periods in which [homemaker services] aid was dispensed [was] identical," HHS' refusal to accept the latter arrangement as sufficient for Medicaid purposes "effects a meaningless distinction . . . . The mere difference in the manner [of reimbursement] is insufficient to bar the payment of [Medicaid] funds claimed [by the State]." Brief for Petitioner at 32–35.

■ We reject New Jersey's suggestion that nothing of import transpired when the State abandoned the "special needs" formula for determining OAA eligibility and substituted in its place a "flat grant" approach. On the contrary, prior to July 1, 1971, an aged individual whose income and resources exceeded the nominal OAA ceiling could nonetheless receive *cash* payments if he or she required homemaker services and was otherwise unable to pay for them. After that date, however, because homemaker services were provided through the auspices of county welfare boards, such an individual was no longer eligible for *cash* assistance in recognition of his or her special needs. The significance of New Jersey's elimination of the possibility of direct cash payments to MAA recipients for homemaker services becomes apparent when considered in connection with two provisions of the Social Security Act. Medicaid coverage was extended automatically only to "individuals receiving aid or assistance" under a state categorical-assistance plan, such as the Old Age Assistance program. 42 U.S.C. § 1396a(a)(10) (1970 version) (current version at 42 U.S.C. § 1396a(a)(10)(A)). And "old age assistance" was defined to include only *"money* payments to . . . needy individuals who are

---

**14.** According to New Jersey's Financial Assistance Manual, § 412.1, effective July 1, 1971, homemaker services were to be purchased

> by direct contractual arrangement and payment . . . between the County Welfare Board and the community agency furnishing approved homemaker services or an individual

who is mutually acceptable to the eligible unit and the County Welfare Board. Such purchase may be made for a person or persons for whom illness, death or other disruption in normal family living has [made] homemaker service . . . essential.

Brief for Petitioner at xix.

65 years of age or older." 42 U.S.C. § 306(a) (repealed 1974) (emphasis added).[15] In other words, according to the Act, only persons who received "money payments" could be said to be recipients of OAA "aid or assistance," and therefore only such persons qualified for "categorically needy" treatment under the Medicaid statute. Applying this principle, it is clear that, from January 1970 to July 1971, institutionalized MAA recipients were covered under New Jersey's Medicaid program because such persons were eligible for "aid or assistance" under the State's OAA plan in the form of "money payments" for homemaker services. From July 1971 to October 1973, however, the possibility of "money payments" for homemaker services ceased. We conclude, therefore, that after July 1971, members of New Jersey's MAA population were not eligible for "aid or assistance" under the State's OAA plan and thus were not within the scope of New Jersey's Medicaid program.

█ Indeed, as the Grant Appeals Board observed, it would be difficult to reconcile any contrary conclusion with the overall Medicaid statutory scheme. New Jersey contends that no meaningful distinction can be drawn between the post- and pre-July 1971 periods because the indirect provision of homemaker services through local welfare agencies is no less a form of "aid or assistance," within the meaning of 42 U.S.C. § 1396a(a)(10), than is the direct disbursement to eligible persons of cash earmarked for such services. Homemaker services, however, are only one type of optional social services that a state is permitted to make available, in connection with its OAA plan, both to OAA recipients and non-recipients alike.[16] Acceptance of New Jersey's argument would mean that individuals who benefited not only from homemaker services, but also from any of the other optional social services provided by the State, would be deemed recipients of "aid or assistance" and would therefore be covered under Medicaid—despite the fact that many of these individuals did not qualify for OAA cash assistance. We decline, however, to "require as a matter of law that medical assistance be furnished to anyone," however financially well-endowed, who "receiv[es any] optional services under [any of a state's categorical-assistance] plans," Grant Appeals Board Decision, *supra*, Appendix at 9a. We believe, following the Board, that "when [s]ection [1396a(a)(10) ] speaks of making medical assistance available to all individuals receiving aid or assistance under any plan of the State, ... it is referring [only] to the 'categorically needy.' " *Id.*

### B

█ New Jersey maintains that, even if institutionalized MAA recipients were not included within the terms of its Medicaid plan from July 1971 to October 1973, HHS nevertheless should be estopped from denying the requested reimbursement. In essence, the State claims that it did not extend Medicaid coverage to MAA individuals because it relied on erroneous advice disseminated to it by representatives of the Department.

---

15. In relevant part, 42 U.S.C. § 306(a) provided that "the term 'old-age assistance' means money payments to, or ... medical care in behalf of or any type of remedial care recognized under State law in behalf of, needy individuals who are 65 years of age or older ...." The reference to medical and remedial care ceased to have definitional import once the Medicaid program became operational. *See* Pub.L.No. 89 97, § 121(b), 79 Stat. 286, 352 (1965), codified at 42 U.S.C. § 1396b (note).

16. 42 U.S.C. § 303(a)(4)(A)(ii) & (iii) authorized a state to provide in conjunction with its OAA plan a wide range of optional services, designed to reduce or prevent the dependency of persons who were or were likely to become OAA recipients. *See* 45 C.F.R. § 222.55 (1976 ed.) (identifying various groups to whom optional services could be furnished). Such optional services—which included, in addition to homemaker services, the provision of, *inter alia*, day care, companionship, educational, financial, recreational, consultant, and legal services, *see* 45 C.F.R. §§ 222.55.–61 (1976 ed.) —were classified as "costs of administration" of a state's OAA program, and accordingly were reimbursable by the federal government to a lesser extent than ordinary OAA cash-assistance expenditures. *Compare* 42 U.S.C. § 303(a)(4)(A) *with* 42 U.S.C. § 303(a)(1).

In support of its estoppel argument, New Jersey points to the following evidence in the record: (1) In 1968, when New Jersey's Medicaid plan was being drafted, an HHS Regional Commissioner notified the State that it could not expect to transfer its entire institutionalized MAA population to the Medicaid rolls because that population included "individuals whose income and resources are in excess of the standard of need established by the State for OAA purposes." The Commissioner cautioned that "[s]hould the State wish to include such individuals in its Title XIX plan, it would be required, by virtue of [42 U.S.C. § 1396a(a)(10)(B)], to provide for all categorically related persons who met the same standard of medical need." Letter from J. Callison (May 22, 1968), Appendix at 30a–33a. (2) In a 1976 affidavit, an official responsible for the State's Medicaid effort averred that "[d]uring all of my years with the New Jersey Medicaid Program, representatives from [HHS] never advised us that any part of the MAA population could be transferred to the Medicaid rolls so as to qualify for federal funding—[i]ndeed, it was always my understanding that [HHS] had advised us that no such transfer could be made." Affidavit of W. Metcalf, Deputy Director, Division of Medical Assistance and Health Services, N.J. Department of Institutions and Agencies (Apr. 6, 1976), Appendix at 34a–39a. (3) In a companion affidavit, a second State official stated that he had been advised "that there was no way that the MAA population could be transferred to [Medicaid] unless New Jersey adopted a medically indigent program." Affidavit of W. Jones, Superintendent, Hudson County Meadowview Hospital (Apr. 6, 1976), Appendix at 44a. (4) An HHS official who served in 1970 as liaison to New Jersey recalled that "State staff were informed that if the State wished to include the over 65 medically needy it would have to include all categorically related groups." The official conceded that she was "unaware that if a State included a special

needs allowance in its Welfare Plans certain groups would be eligible for Medicaid." Memorandum of T. Kern, Senior Medical Services Specialist, HHS (July 2, 1976), Appendix at 52a. (5) In 1976, after reviewing the available evidence, an HHS Acting Regional Commissioner recommended that New Jersey's claim for reimbursement be honored "in the interest of equity." In arriving at this recommendation, the Commissioner stressed the fact that "[t]he option whereby the State could have extended Title XIX coverage to a majority of the . . . MAA caseload was apparently never pointed out by anyone [at HHS]," and the fact that HHS officials "failed to recognize and point out [the] significance" of New Jersey's conversion from a "special needs" to a "flat grant" OAA eligibility approach. Memorandum of W. Toby (June 23, 1976), Appendix at 49a–51a.

New Jersey concludes from this evidence that the record "clearly establishes" that "responsible federal regulators," demonstrably unable to decipher "obscure and unfathomable" statutes and regulations, "unwitting[ly]" misinformed and misled State officials with respect to the incorporation of the MAA population into the Medicaid program. The State contends that in light of "the unique federal-state relationship created by Title XIX," in view of the State's "unavoidable reliance upon . . . federal expertise," and in order "to prevent manifest injustice," HHS should be barred, on equitable grounds, from punishing New Jersey for any "technical noncompliance" with statutory requirements. Brief for Petitioner at 1, 27; Reply Brief for Petitioner at 7–8.

We find New Jersey's estoppel argument unpersuasive. Even if it were clear as a legal matter that estoppel could be invoked against the federal government, we would still be obliged to conclude that the State does not make out a compelling estoppel claim, given the particular facts present here.[17] This Court recently declared that

17. In view of our resolution of this "factual" question, it is unnecessary for us to decide whether, as a matter of law, estoppel is availa-

ble against HHS in this case. In passing, we note that it is true, as New Jersey stresses, that the modern trend diverges somewhat from the

[t]he party asserting estoppel must show more than that he was ignorant about some matter. Among the more important requirements of estoppel are that the party to be estopped has misrepresented or wrongfully concealed some material fact and that this party acted with the intention that the asserting party rely to his detriment on his misunderstanding. *United States ex rel. K&M Corp. v. A&M Gregos, Inc.*, 607 F.2d 44, 48 (3d Cir. 1979); *see also Consolidated Express, Inc. v. New York Shipping Association, Inc.*, 602 F.2d 494, 510 (3d Cir. 1979), *vacated and remanded on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980). Nothing in the evidentiary material proffered by New Jersey indicates that federal officials "misrepresented" or "wrongfully concealed" information about the Medicaid statute "with the intention" that the State rely "to [its] detriment" on the resulting "misunderstanding." New Jersey cannot show—and, indeed, does not attempt to show—that HHS specifically instructed the State that MAA individuals could not be covered under Title XIX even if a "special needs" requirement were to be adopted. Similarly, New Jersey does not demonstrate—and, for that matter, does not attempt to demonstrate—that HHS directly advised the State that nothing of significance would follow from the replacement of a "special needs" with a "flat grant" standard for determining OAA eligibility. To be sure, State officials were informed (for example, by Commissioner Callison) that they could not expect to make Medicaid benefits available to "medically needy" elderly persons without simultaneously extending coverage to other, similarly-situated "medically needy" individuals. In view of 42 U.S.C. § 1396a(a)(10)(B), however, this information, far from constituting a "misleading" assertion, was correct. If anything, HHS might be faulted for failing to advise the

State that it could achieve its desired result by adopting a "special needs" formulation for use in conjunction with Regulation 248.-10(b)(2)(ii). In our view, however, this "fault"—if it can be characterized as such—hardly rises to the level of "misrepresent[ation]" and "wrongful[ ] conceal[ment]" sufficient under *United States ex rel. K&M Corp.* to justify recognition of a defense of estoppel.

In arriving at our conclusion that the incidents described by New Jersey do not satisfy the factual threshold necessary for a successful estoppel claim, we have been guided by traditional notions as to the elements of estoppel, derived from cases such as *United States ex rel. K&M Corp.* involving two or more private litigants. The Supreme Court has recently intimated, however, that where estoppel is asserted against the federal government, a more exacting factual showing may be mandatory. In *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980), the Second Circuit estopped HHS from denying Social Security benefits to a claimant who did not apply for them after being told, erroneously, by a representative of the Department that she was ineligible. The Supreme Court summarily reversed. *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). Despite the urgings of the two dissenting Justices, *id.* at 791–92, 101 S.Ct. at 1472–1473, the Court declined to define precisely "what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations." *Id.* at 788, 101 S.Ct. at 1470. The majority did determine, however, that the behavior of the employee under review—which the Second Circuit concluded did not amount to "affirmative misconduct," 619 F.2d at 948— "'fal[ls] far short' of conduct which would raise a serious question whether [HHS] is estopped from insisting upon compliance"

doctrinaire position, announced in earlier cases, that estoppel could not be invoked against the government. *Compare United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973) *with Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *see* Note, *Equitable Estoppel of the Govern-*

*ment,* 79 Columbia L.Rev. 551 (1979). It is arguable, however, that many of the "modern-trend" cases are not reconcilable with language contained in the Supreme Court's recent decision in *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (see especially footnote 4).

with the agency's application requirement. *Id.*, 450 U.S. at 790, 101 S.Ct. at 1472. And in the course of canvassing both its own and various lower federal court decisions where the estoppel-against-the-government issue had been considered, the Court made it clear that it remained an open question whether a showing "even [of] 'affirmative misconduct'" would justify a claim of estoppel. *Id.* at 788, 101 S.Ct. at 1471. With respect to the present dispute, HHS was not guilty of some sort of "affirmative misconduct" when it allegedly misinformed or failed to inform New Jersey about the possibility of Medicaid coverage for the MAA group. A faithful application of *Schweiker v. Hansen*, therefore, compels the conclusion that New Jersey has failed to identify a factual predicate sufficient to estop an agency of the government from carrying out its statutory responsibilities.

■ New Jersey insists that, with respect to the transaction under review, HHS violated its "fiduciary" responsibility to aid the State in establishing "as expansive a [Medicaid] program as possible." Brief for Petitioner at 21–22. More specifically, New Jersey contends that

> [HHS] has an affirmative duty to assist the states in developing as inclusive a program as possible with the aid of Federal funds, . . . [that] Title XIX is remedial legislation and [therefore should] be given liberal interpretation, . . . that [the State] could not be expected to understand and apply [Regulation 248.-10(b)(2)(ii)] without special guidance from Federal officials, . . . [and that] by denying [its] claim for [reimbursement], [HHS] thwarts the State's discretion to develop a medical assistance program to meet its needs and undermines the framework of cooperative federalism since the State can no longer rely on Federal expertise.

Grant Appeals Board Decision, *supra*, Appendix at 6a–7a.

In advancing this conglomerated attack, New Jersey appears to misperceive the relative responsibilities placed on a participating state and on the federal government in connection with a "cooperative" endeavor such as Medicaid. It bears repeating that there is no uniform, nationwide Medicaid plan per se: a state is not required to participate in the Title XIX program. To the extent it chooses to do so, it is free to fashion its own Medicaid arrangement, consistent with certain statutory requirements, *see* 42 U.S.C. § 1396a(a), and subject, as previously mentioned, to the approval of the Secretary, *see id.* at § 1396a(b). *See Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). It is the state that determines how much medical assistance it is "practicable" to provide in view of "the conditions in [the] State," 42 U.S.C. § 1396; it is the state that initially decides which optional groups, if any, will be brought under its Medicaid umbrella, *see id.* at § 1396a(a)(10); it is the state that actually administers whatever plan is ultimately adopted, *see id.* at § 1396a(a)(4) & (5).

By contrast, the federal role, at least with respect to the direct formulation and implementation of a State's Medicaid plan, is more limited. To be sure, the Secretary is responsible for ensuring that such a plan, both on its face and in its administration, conforms to statutory mandates, *see* 42 U.S.C. §§ 1396a(b) & 1396c; and of course, the federal government has promised to bear a substantial percentage of "the total amount expended . . . as medical assistance under the State plan," *id.* at § 1396b(a)(1). We find nothing in Title XIX or its legislative history, however, that obligates HHS to take all reasonable efforts to ensure that a state receives its maximum possible share of federal Medicaid dollars. For that matter, New Jersey has directed us to no case imposing financial liability upon HHS for its "failure" as a "fiduciary" either to investigate fully the "conditions" existing in a particular state or to advise officials of that state with respect to the drafting or the amendment of their Medicaid plan. Federal officials "are not privy to the various policy considerations which determine the scope of a State plan and cannot be expected to anticipate problems which might re-

sult from the State's implementation of its plan." Grant Appeals Board Decision, *supra*, Appendix at 8a.[18]

We do not make light of the difficulties confronted by state officials attempting to come to grips with "this complicated statute," *Beal v. Doe*, 432 U.S. 438, 447, 97 S.Ct. 2366, 2372, 53 L.Ed.2d 464 (1977). Nor do we suggest that HHS' vast reservoir of expertise and resources is unavailable to Medicaid planners in the various state governments. We are not prepared to hold, however, that the federal government has a legally enforceable obligation to provide advice and guidance to the states regarding the content of their Medicaid plans. Accordingly, we reject New Jersey's estoppel-based argument.

### C

 New Jersey contends that, in any event, it should be permitted retroactively to amend its Medicaid plan in order to qualify for federal financial participation for medical services provided to MAA recipients during the July 1971 to October 1973 period. The State correctly observes that nothing in the Social Security Act directly bars the Secretary from accepting such an amendment.

New Jersey's proposed course of action is explicitly prohibited by administrative regulation, however. Specifically, 45 C.F.R. § 201.3(g) stipulates that the effective date of an amendment that makes new groups eligible for assistance or services provided under the approved state plan "may not be earlier than the first day of the calendar quarter in which [such an amendment] is submitted." New Jersey urges that we "waive" this "purely procedural" restriction. We decline to do so for three reasons. First, we find nothing in the Act or any of

its accompanying regulations that would authorize us to create such a waiver. In a somewhat analogous situation, the Supreme Court refused to "waive" the requirement that individuals file a written application for Social Security benefits. According to the majority, "[a] court is no more authorized to overlook the valid regulation requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits." *Schweiker v. Hansen, supra*, 450 U.S. at 790, 101 S.Ct. at 1472. Second, we are convinced that the prohibition of retroactive plan amendments contained in Regulation 201.3(g) serves a useful purpose. As the Grant Appeals Board observed, if New Jersey were now permitted to alter its former Medicaid plan in order officially to cover the MAA population, it could no longer be determined, for example, "whether in the administration of the MAA program during [the July 1971 to October 1973 period] the State applied the revised standard of eligibility established by the amended State plan to all eligible or potentially eligible individuals," as required under 42 U.S.C. § 1396a(a). Grant Appeals Board Decision, *supra*, Appendix at 10a. Finally, we are reluctant to waive Regulation 201.3(g) in this instance lest other states, following New Jersey's example, seek similar retroactive reimbursements for medical services provided to groups not covered, for whatever reasons, under their original Medicaid plans.

### D

 We have also considered New Jersey's contention that HHS misdetermined the State's MAA income-eligibility standard and therefore imposed a disallowance excessive in amount. We believe this contention to be without merit, for the reasons set

---

**18.** In the proceeding below, the Grant Appeals Board also noted that

> [i]f a state has any doubt whether it is entitled to [federal reimbursement], it may submit a claim and receive an official Agency determination. Likewise, if a state has a question whether any group may be properly included within the state plan, it may include the group and receive an official Agency de-

> termination whether such inclusion conforms with the statutory requirements. In both instances, there are review and appeal rights which the state may pursue.

Grant Appeals Board Decision, *supra*, Appendix at 8a. The Board concluded, therefore, that "even if New Jersey was misinformed" by HHS, in view of these alternatives "the State was not diligent in protecting its interests." *Id.*

forth by the Grant Appeals Board in its decision below. *See* Grant Appeals Board Decision, *supra*, Appendix at 10a.

## IV

New Jersey's petition for review will be denied.