713 F.2d 1563
 4 ITRD 2369, 1 Fed. Cir. (T) 151
 The UNITED STATES, The United States Customs Service,
Benjamin C. Jefferson, Peter Noonan and Melvin
Minsky, Appellants/Cross-Appellees,
v.
BAR BEA TRUCK LEASING CO., INC., Bar-Mar Warehouse Co.,
Inc., Appellees/Cross-Appellants.
 Appeal Nos. 82-36, 83-515.
 United States Court of Appeals,
Federal Circuit.
 Aug. 11, 1983.
 
 John J. Mahon, New York City, argued for cross-appellants. With him on the briefs were J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Joseph I. Liebman, Atty. in Charge and Saul Davis, New York City.
 Frederic J. Gross, Haddonfield, N.J., argued for cross-appellee.
 Before MARKEY, Chief Judge, and FRIEDMAN and KASHIWA, Circuit Judges.
 MARKEY, Chief Judge.
 
 
 1
 The government appeals from that part of a judgment of the United States Court of International Trade (CIT), 456 F.Supp. 558, holding that Bar-Mar Warehouse Co., Inc. (Corporation II) is the "de facto" holder of customhouse license 1777 (the license) issued to Bar-Mar Trucking Co., Inc. (Corporation I), and enjoining the government from nullifying the license.
 
 
 2
 Corporation II and Bar Bea Truck Leasing Co., Inc. (Corporation III) cross-appeal from that part of the judgment enjoining the latter from operating under the license, and urge that the CIT has no jurisdiction under 28 U.S.C. § 1581(i)(4) over cartmen's license disputes.
 
 
 3
 We reverse in part and affirm in part.
 
 Background
 
 4
 19 U.S.C. § 1565 and 19 C.F.R. §§ 112 et seq. govern issuance and use of cartmen's licenses and define a statutory and regulatory scheme by which the Customs Service (Customs) assures the importing public that those entities operating as cartmen to transport merchandise within the limits of a port have been licensed by appropriate authorities and that an investigation of their character and fitness to operate has been conducted. The regulations require that cartmen be bonded so as to protect importers against any loss of, or damage to, the merchandise being carted, § 112.22, and that they annually furnish to Customs a current listing of their officers, members or employees, § 112.29 so that Customs is aware of changes which may bear on the cartman's continued fitness. The regulations provide further assurances to importers by directing that a license be suspended or revoked because of improper conduct of the license holder, e.g., the holder fraudulently obtained the license, was convicted of a felony or misdemeanor involving theft, was negligent or dishonest in the conduct of his business, or allowed the license to be used by another. § 112.30.
 
 
 5
 On February 7, 1966, Customs issued the license to Corporation I, a New Jersey corporation engaged in cartage of cargo. The necessary bond was provided by International Fidelity Insurance Co. That bond was cancelled on January 12, 1968. The record indicates that Corporation I went out of business. On January 20, 1969, International Fidelity issued a new bond on behalf of and at the request of Corporation II, a separate corporation controlled by some of the same principals.
 
 
 6
 The officers of Corporation I had been Anthony Gallagher (Gallagher), president; Joseph Castagna, vice-president and treasurer; and Barbara Gallagher, secretary. The officers of Corporation II were Gallagher and Barbara Gallagher, president and vice-president respectively. Gallagher testified that Corporation II was a separate corporation and was not merely a change in name of Corporation I. Though the principals in control do not appear to have been the same, Corporation II asserted that Customs employees had said that one license could be issued to separate corporations controlled by the same principals.
 
 
 7
 During the 13 years between 1969 and 1982, Corporation II conducted its cartage business under the license. During that time, Customs employees accepted correspondence from Corporation II relating to the license and directed correspondence concerning annual updating of the license documents to Corporation II.
 
 
 8
 For at least the last six of those 13 years, Corporation III, controlled by Gallagher, was also using the license. When Corporation III requested its own license in April 1977, Customs indicated that the process would entail an investigation and would take time. Corporation III did not file a license application but continued its operation.
 
 
 9
 On March 22, 1982, Customs notified Corporation II that the license was null and void and demanded the return of the license and related documents. Customs also seized a truck Corporation III was operating purportedly under the license. Customs, apparently still under the impression that the license had been issued to Corporation II, based its nullification notice on the repeal of that corporation's charter by New Jersey for non-payment of that state's corporate franchise taxes. Upon notice of Customs' action, Corporation II paid the arrearages in franchise taxes and its corporate charter was reinstated retroactively by the state.
 
 
 10
 On March 24, 1982, two days after Customs' nullification of the license, Corporation III filed an application for its own customhouse license. That application was denied by Customs.
 
 
 11
 Because Customs refused to grant Corporation II a hearing or to honor the New Jersey reinstatement of its corporate charter, Corporations II and III filed this action in the United States District Court for the District of New Jersey, seeking declaratory and injunctive relief, return of the seized truck, and compensatory and punitive damages. The district court transferred the entire case to the CIT on April 28, 1982.
 
 
 12
 In an opinion dated August 11, 1982, the CIT held that Corporation II was the "de facto" holder of the license, relying on Customs' long recognition and treatment of that corporation as the licensee and on Customs' maintenance of the file relating to the license in that corporation's name. The court also determined that Customs' basis for nullification, i.e., the revocation of the corporate charter, was not valid once the charter was reinstated because under New Jersey law reinstatement is retroactive and validates all acts taken by the corporation while its charter was void. The court therefore enjoined the government from taking any further action to nullify the license on the basis of the charter revocation.
 
 
 13
 Respecting Corporation III, the court denied declaratory and injunctive relief in all respects, and permanently enjoined that corporation from operating under the license. The court severed certain tort claims and transferred them back to the district court.
 
 Issues
 
 14
 (1) Whether the CIT has jurisdiction over cartman's license disputes under 28 U.S.C. § 1581(i)(4).
 
 
 15
 (2) Whether the CIT erred in holding that Corporation II is the "de facto" license holder of the license and in enjoining the government from nullifying the license.
 
 
 16
 (3) Whether the CIT erred in enjoining Corporation III's use of the license.
 
 OPINION
 
 17
 (1) Jurisdiction
 
 
 18
 The CIT held in Di Jub Leasing Corp. v. United States, 505 F.Supp. 1113 (C.I.T.1980) that disputes involving revocation of a cartman's license are within its exclusive jurisdiction under 28 U.S.C. §§ 1581(i)(1) and (4):[1]
 
 
 19
 [T]he present action contesting the revocation of Di Jub's cartman license is within this Court's exclusive jurisdiction under 28 U.S.C. § 1581(i)(1) and (4) because the revocation of a cartman's license ... is so intertwined with and directly related to the administration and enforcement of the laws providing for revenue from imports. I have no doubt that, by the residual grant of jurisdictional authority in § 1581(i), Congress intended to assure comprehensive review in this Court of a broad spectrum of administrative actions arising out of our international trade laws, including those laws concerning the suspension or revocation of various customs licenses. Were the opposite true, it would frustrate a major Congressional goal of the Customs Courts Act of 1980 to "eliminate the confusion which currently exists as to the demarcation between the jurisdiction of the district courts and the Court of International Trade." H.R.Rep. No. 96-1235, at 47, U.S.Code Cong. & Admin.News 1980, p. 7118. [Emphasis in original]
 
 
 20
 Id. at 1117.
 
 
 21
 Corporations II and III say Di Jub was wrongly decided and that the cartman's license revocation dispute should be decided by the district court. We find no reason, however, to disturb the construction of 28 U.S.C. §§ 1581(i)(1) and (4) adopted in Di Jub and applied here by the CIT.
 
 
 22
 That Congress explicitly gave exclusive jurisdiction to the CIT over customhouse broker's license disputes in § 1581(g), but made no similar explicit grant respecting cartman's license disputes, does not itself indicate a congressional intent to exclude the latter from the court's jurisdiction. The corporations point to no portion of the legislative history of the Customs Court Act of 1980 suggesting that Congress so intended. On the contrary, as the CIT noted in rejecting a substantially identical argument in Di Jub:
 
 
 23
 [T]he Judiciary Committee commented (H.R.Rep. No. 96-1235, 46 U.S.Code Cong. & Admin.News 1980, p. 7116):
 
 
 24
 * * * In keeping with the underlying policy of this legislation [H.R. 7540] to establish a uniformity of jurisdiction of civil actions involving the tariff and international trade laws, the Committee believes it is appropriate to repose jurisdiction over these cases [customhouse broker's licenses] in the Court of International Trade. * * * [Emphasis added.]
 
 
 25
 The rationale expressed above by the House Committee on the Judiciary for reposing jurisdiction in the Court of International Trade of actions involving customhouse brokers' licenses is equally apposite to actions contesting the revocation of a cartman's license.
 
 
 26
 Id. at 1118-9.
 
 
 27
 We hold, therefore, that the CIT has jurisdiction over cartman's license disputes.
 
 
 28
 (2) "De Facto" License
 
 
 29
 Under the applicable statutory and regulatory scheme, the district director of Customs has exclusive authority to issue and revoke cartman's licenses. 19 U.S.C. § 1565 and 19 C.F.R. §§ 112.21, 112.24 and 112.30. That authority is in turn circumscribed by specific requirements that must be met by applicants for cartman's licenses. 19 C.F.R. §§ 112.22. Under the statutory and regulatory scheme, therefore, there can be no such thing as a "de facto" license, and the concept that one may acquire that status by long continued use of the license of another would tend to undermine the protective intent of the statute and regulations.
 
 
 30
 It is undisputed that the license was issued to Corporation I, that Corporation II never applied for a license and was never issued a license.
 
 
 31
 That Customs employees accepted documents relating to the license from Corporation II, in the mistaken belief that it was the license holder (a mistake not surprising when the similarity of corporate names employed by the one who submitted the documents is noted), cannot constitute the grant of a license to Corporation II, or a transfer to it of the license, under the statute and regulations. No Customs employee had authority to issue a license and there is no evidence that the district director delegated that authority to any such employee. Corporation II's assertion that the director's own name appears on some of the correspondence is equally unavailing. The director, if he signed such correspondence, presumably did so under the mistaken belief that Corporation II was the licensee. In any event, the director is without authority to permit a non-licensed cartman to operate under the license of another.
 
 
 32
 Acceptance of documents and correspondence by Customs directors or employees could not constitute authorization for Corporation II to operate under the license issued to Corporation I, without defeating the purpose and function of the statute and regulations. Use of a cartage license by any person other than the actual license holder is specifically set forth as grounds for revocation of the license in 19 C.F.R. § 112.30(a)(6), and no Customs directors or employees had authority to waive that regulation through inadvertence and under a misapprehension. Corporation II thus at no time had any statutory or regulatory right to use the license, and its use constituted grounds for revocation.
 
 
 33
 Considerations of waiver or equitable estoppel as a basis for designating Corporation II the "de facto" holder of the license are inappropriate. The regulations describe the role of the cartman as the transportation of merchandise within the limits of a port for possible storage or subsequent examination of the merchandise by Customs officers. In requiring that those persons meet the standards established for licensees and that they be bonded, the government acts in its sovereign, rather than its proprietary, capacity. It acts for the benefit of the importing public, protecting it against losses occasioned by a cartman's failure to safely transport and deliver merchandise to the appropriate Customs officer. The existence of a bond does not alone assure adequate and controlled protection when a non-licensed entity, though bonded, is operating under the license of another. Estoppel may not be asserted against the government in those circumstances. Air Sea Brokers, Inc. v. United States, 596 F.2d 1008 (CCPA 1979).
 
 
 34
 Corporation II asserts a placement of "good faith reliance" on the actions of Customs employees who processed correspondence from it. That reliance might be as accurately described as placed on its long-continued success in misleading those employees. We need not, and hence do not, decide whether the assertion here is one of good faith reliance on one's own improper conduct. The Customs employees whose conduct is allegedly relied upon did not and could not grant Corporation II a license. If the employees' mere acceptance and filing of documents be viewed as the grant of a license, "de facto" or otherwise, that conduct must also be viewed as outside the scope of their authority and thus not binding on the government. See Yosemite Park & Curry v. United States, 582 F.2d 552 (Ct.Cl.1978).
 
 
 35
 Nor could erroneous advice or neglect on the part of customs employees estop the government from enforcing regulations authorized by statute. Schweiker v. Hansen, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).
 
 
 36
 Corporation II alleges the absence of established procedures designed to provide due process to license holders when Customs elects to cancel, revoke, or nullify a cartman's license. As a non-license holder, Corporation II has no standing to raise that issue.
 
 
 37
 Because Corporation II's use of the license was unauthorized and contrary to statute and regulation, it was error to hold it a "de facto" holder of that license and to enjoin the government from revoking or nullifying that license.[2]
 
 
 38
 (3) Corporation III's Use of the License
 
 
 39
 Corporation III says it is entitled to operate under the license on a theory of equitable estoppel and that the CIT therefore erred in enjoining its use of the license.
 
 
 40
 As set forth above, equitable estoppel is inappropriate and may not be asserted to establish a right in Corporation III to operate under the license issued to another. Considerations precluding Corporation II's use apply equally to use by Corporation III. The CIT found that Corporation III failed to meet reliance and other factors supporting estoppel. That approach was incorrect, but harmless. The CIT correctly determined that Corporation III had no right to operate under the license and therefore properly enjoined such operation.
 
 Decision
 
 41
 That part of the appealed judgment holding that Corporation II is the de facto holder of the license, and enjoining the government from nullifying the license, is reversed. The judgment is affirmed in all other respects.
 
 
 42
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 [1]
 28 U.S.C. 1581(i)(1) and (4) provide that:
 (i) In addition to the jurisdiction conferred on the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for
 (1) revenue from imports or tonnage;
 ....
 (4) administration and enforcement with respect to the matters referred to in
 paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.
 
 
 [2]
 In view of our holding that Corporation II never acquired rights to use the license, we need not resolve the arguments on whether New Jersey's voiding of its corporate charter formed a proper basis for Customs' "nullification", and on whether New Jersey's reinstatement of the charter had any effect on that nullification. Because Corporation II cannot be a holder of the license, nothing would appear to impede the government, should it so desire, from cancelling, revoking, or nullifying it on the ground that the licensee, Corporation I, is and has long been non-existent or on the ground that Corporation I permitted use of its license by Corporation II. 19 C.F.R. § 112.30(a)(6)