UNITED STATES, PLAINTIFF *v.* INDIA FOOD AND GOURMET, AND PEERLESS INSURANCE CO., DEFENDANTS

Court No. 83–12–01740

Before RESTANI, *Judge.*

(Decided March 25, 1985)

*Richard K. Willard,* Acting Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, and *Kenneth N. Wolf,* United States Department of Justice, Civil Division, for plaintiff.
*Richard L. Furman,* for defendant India Food and Gourmet.

*Sage, Gray, Todd & Sims (John J. Hannaway)* for defendant Peerless Insurance Company.

RESTANI, *Judge:* In this action, the United States has moved for summary judgment and seeks to collect liquidated damages allegedly arising from the importation of three shipments of adulterated food products. Jurisdiction in this matter is predicated upon 28 U.S.C. § 1582 (1982).

## I

The following facts surrounding the three importations are not in dispute. On November 21, 1977, defendant India Foods ("India") imported 400 bags of Basmati rice at the port of New York. On November 29, 1977, India with defendant Peerless Insurance Company ("Peerless") as surety, executed an immediate delivery and consumption entry bond payable to the government. Accordingly, the United States Customs Service ("Customs") released the rice to India on the same day. In December, 1977, the Food and Drug Administration ("FDA") took a sample of the rice and found it contained live and dead insects. A notice of detention was issued on December 14, 1977 by which the FDA informed India of a violation of § 801(a)(3) of the Federal Food and Drug Act, 21 U.S.C. § 381(a) (1976), and told India to keep the shipment intact pending a final decision concerning admission of the goods. On January 4, 1978, India filed entry papers regarding the rice. On September 27, 1978, the goods were denied admission into the United States and India was so notified by means of a form from the District Director of Customs. The form told India it had ninety days plus any additional time granted to export the rice or the rice would be destroyed.[1]

India also imported 400 more bags of rice in May, 1978. Again, India with Peerless as surety executed a single entry bond payable to the government and the rice was released to India on June 2, 1978. Later that month the shipment was sampled and found to contain dead insects. A notice of detention was issued June 18, 1978, but entry papers were filed on June 30, 1978. On September 21, 1978, the District Director of Customs, using a form exactly like the one later used for the first shipment of rice, notified India of the refusal to admit the goods and gave India ninety days to export the rice.[2]

After the second shipment of rice, India imported into the United States one hundred cases of pickles on October 6, 1978. As with regard to the rice shipments, a bond with Peerless as surety was executed. Again the government was listed as payee and the merchandise was released on October 11, 1978. Later that month,

---

[1] The relevant provision of the notice stated:

You are hereby notified that admission of above-described merchandise is refused. The merchandise must be exported under Custom's supervision within 90 days from the date of this notice or within such additional time as the District Director of Customs specifies. Failure to do so may result in destruction of the merchandise as authorized by the statute.

[2] Thus, the second rice shipment actually was denied admission before the first shipment.

the FDA took samples and found that the pickles contained rodent hairs. On October 26, 1978, a notice of detention was issued. On January 10, 1979, the District Director of Customs refused admission of the goods, utilizing the same type of form used for the rice shipments. Again, that form stated that India had ninety days in which to export the goods or the goods would be destroyed.

## II

By letter dated April 10, 1979, Customs informed India that Custom's records did not disclose compliance with a directive to export the pickles or have them destroyed under Customs' supervision.[3] The letter also stated that Customs would seek liquidated damages under the redelivery portion of the entry bond. By letter dated April 23, 1979, regarding Customs' decision on all three shipments, India's sole proprietor, Mr. Kishor, wrote to Customs asking for an extension of time. In his affidavit Mr. Kishor stated that his written request was hand-delivered by him and orally agreed to by a Customs official. The specifics of that request are unclear, but if the extension was granted, India's time to export the goods from this country would have been extended until May 23, 1979.

On September 26, 1979, Customs issued notices demanding payment of liquidated damages for each of the three shipments for failure to redeliver the goods to Customs custody as required by the redelivery provision, paragraph 4, of each of the entry bonds. In an inter-department letter, dated March 26, 1982, the Regional Counsel of Customs informed the Regional Commissioner that no redelivery notices as required by 19 CFR § 141.113(b) were found in Customs' records.[4] Apparently, on March 16, 1982, Customs, therefore, dropped its efforts to collect damages for failure to redeliver.

The discontinuance of the redelivery claims, however, was not the end of Customs' effort to collect liquidated damages. On March 9, 1981, Customs had issued a second group of notices of demand for liquidated damages. These demands were based on failure to export the goods under Customs' supervision pursuant to paragraph seven of the entry bonds.[5]

---

[3] The notices of refusal made no mention that India itself could destroy the adulterated goods.

[4] Notices of redelivery were mandated by 19 CFR § 141.113(b) (1976) which provided:
Other merchandise not entitled to admission. If at any time after entry the district director finds that any merchandise contained in an importation is not entitled to admission into the commerce of the United States for any reason not enumerated in paragraph (a) of this section [concerning labeling], he shall promptly demand the return to Customs custody of any such merchandise which has been released.

[5] Paragraph 7 of each bond provided:
And in the case of any and all merchandise found not to comply with the law and regulations governing its admission into the commerce of the United States the above bounden principal after proper notice shall mark, label, clean, fumigate, destroy, export and do any and all other things in relation to such merchandise that may be lawfully required and shall hold the said merchandise for inspection and examination, unless the said principal shall file with the district director of customs a bond on customs Form 7601 in which the actual owner whose declaration has been filed pursuant to section 485(d) shall have undertaken after proper notice to mark, label, clean, fumigate, destroy, export, and do any and all other things in relation to the said merchandise that may be lawfully required, and to hold the said merchandise for inspection and examination, or in default thereof shall pay to the district director of customs as liquidated damages as amount equal to the value of the merchandise with respect to which there has been a default, as set forth in the entry, plus the estimated duties thereon, as determined at the time of entry.

India's refutation of the liquidated damage claims were voiced in a letter to Customs dated January 2, 1980, written in response to the claims based on failure to redeliver. With that correspondence, India submitted a letter it had received from the city of Jersey City, New Jersey. The Jersey City letter stated that the city's agents had inspected the Advance Warehouse in Jersey City (where the goods had been stored since refusal of admission) and found several hundred sacks of beans, rice, sugar and powder on pallets soiled with rodent urine and droppings. Based on that inspection, the New Jersey State Department of Health "embargoed" the food commodities in the Advance Warehouse and the city demanded that the goods be dumped in a landfill by May 22, 1979. The city's letter was dated May 14, 1979.

By letter dated March 6, 1980, Customs informed Mr. Kishor that in order to prevent assessment of liquidated damages, it would require an affidavit from him detailing the exact number of bags of rice and cartons of pickles that were destroyed under the aegis of Jersey City. Customs also requested an affidavit from J. Scerbo Rubbish and Garbage Removal, whose receipt Mr. Kishor had submitted in his January 2, 1980 letter. Customs then stated that the documents would be sent to the FDA for review.

Responding to Customs' request, Mr. Kishor sent Customs a letter dated June 23, 1980, and enclosed letters from Scerbo and the Advance Warehouse. The Scerbo letter was handwritten and addressed to Advance Warehouse Corp. It stated: "In August 1979 we took 4 roll of containers containing rice in bags, pickles in ctns, etc. to M.L.S.A. dump site in Kearny, N.J. and it was dumped and pushed by a bulldozer." Advance Warehouse's letter was addressed to Customs and stated that Mr. Kishor's merchandise "such as rice in bags, pickles in ctns, etc. were stored in our warehouse", "embargoed" in May 1979, and completely destroyed by Scerbo.

Customs, pursuant to the FDA's advice, refused to either terminate its effort to collect liquidated damages or to mitigate the damages. The agency found no evidence that India's goods were destroyed under official supervision or that the goods were among those destroyed by Scerbo. Furthermore, Customs noted that Jersey City's "embargo" occurred eight months after the goods were refused admission. Consequently, during 1981 and 1982 Customs made several unsuccessful demands on India and then made several demands on the surety, Peerless, which were also unfruitful.

## III

Summary judgment is proper in a collection case involving a bond when no genuine issue of material fact exists. *di Giorgio* v. *United States,* 8 CIT 192, Slip Op. 84–107 (September 27, 1984). The instant

case, however, presents the court with several questions of material fact.

First, the occurrence and scope of the claimed extension of time of April 23, 1979, remains unclear. Plaintiff's papers neither admit nor deny that possible extension. Plaintiff argues that even if the extension had been granted, the bonds were still breached because destruction did not occur until August, 1979. As previously noted, the precise reason for and effect of the extension referred to in Mr. Kishor's letter to Customs is not resolved. If that alleged oral extension amounted to a grant of additional time in which India could have disposed of each of the three shipments, India may have had until May 23, 1979 to dispose of the goods. If the extension applied only to the containers of pickles, the additional time could have at least affected the disposition of that shipment. Either way, the alleged extension of time may have created a situation in which some or all of the goods were taken from India by the local authority's "embargo" before the alleged additional grant of time had expired.

A second issue of potentially material fact thus arises concerning whether or not India could have complied at all with the Federal demands once its goods were "embargoed" by the state and local authorities. The record before the court does not adequately describe the effect of the "embargo" nor have the parties adequately addressed the legal issue of whether India may be excused from timely complying with the direction to export the goods because of the "embargo."

Third is the issue of whether the goods were destroyed by state or city officials. Plaintiff argues that this issue is irrelevant because only exportation or destruction under federal supervision can satisfy defendants' obligation under the bonds. Plaintiff has cited a regulation, 19 CFR § 12.4, which requires that exportation be conducted under Customs supervision, but paragraph 7 of the bond, and Customs letters and memoranda seem to indicate that destruction may be substituted for exportation. Paragraph 7 of the bonds, however, does not specifically require that destruction be carried out under the supervision of Customs, and plaintiff has cited no regulation to that effect.[6] Therefore, the court finds the plaintiff has not demonstrated the immateriality of the disputed facts.

## IV

Although defendants do not seek summary judgment, the court notes that defendants' arguments made in opposition to plaintiff's motion for summary judgment based on estoppel, laches, and the statute of limitations have not been supported by a demonstration of

[6] 21 CFR § § 1.95–1.96, cited by plaintiff, do not appear to apply to total destruction of goods, but rather to relabelling, reconditioning and destruction of the residue. 21 U.S.C. § 381 (1982), also cited by plaintiff, provides no insight into whether § § 1.95–1.96 were to have a broader meaning, nor does it answer the question of whether or what kind of federal supervision of the destruction of goods is needed for compliance with the bonds.

facts giving rise to such defenses. Furthermore, in a situation such as this when the government is acting in its sovereign capacity to protect the integrity of goods entered into the stream of commerce, it is unlikely that equitable estoppel would apply. *See Air-Sea Brokers, Inc.* v. *United States,* 66 CCPA 64, 68, 596 F.2d 1008, 1011 (1979); *Wally Packaging, Inc.* v. *United States,* 7 CIT 19, 578 F. Supp. 1408, 1410–11 (1984); *see also United States* v. *Bar Bea Truck Leasing Co.,* 713 F.2d 1563, 1567 (Fed. Cir. 1983).[7] Moreover, Customs' effort to collect damages for failure to export (or destroy) after first seeking damages for failure to redeliver was a valid action under the bond.

Accordingly, plaintiff has not met its burden of demonstrating that the facts regarding the extension of time, the "embargo" and subsequent destruction of the goods are immaterial, and plaintiff's motion for summary judgment is denied.

---

[7] This court's recent decision in *United States* v. *Federal Insurance Co.,* 9 CIT 124, Slip Op. 85–32 (March 14, 1985) appears to have no bearing on the instant case. There is no allegation here that the debt which plaintiff seeks to collect arises out of a statutory violation by the Government itself, as the court found in the *Federal Insurance* case.