SCHWEIKER, SECRETARY OF HEALTH AND HUMAN
SERVICES *v.* HANSEN

No. 80–1162.  Decided April 6, 1981

786

Per Curiam.

On June 12, 1974, respondent met for about 15 minutes with Don Connelly, a field representative of the Social Security Administration (SSA), and orally inquired of him whether she was eligible for "mother's insurance benefits" under § 202 (g) of the Social Security Act (Act), 64 Stat. 485, as amended, 42 U. S. C. § 402 (g). Connelly erroneously told her that she was not, and she left the SSA office without having filed a written application. By the Act's terms, such benefits are available only to one who, among other qualifications, "has filed application." 42 U. S. C. § 402 (g)(1)(D). By a regulation promulgated pursuant to the Act, only written applications satisfy the "filed application" requirement. 20 CFR § 404.601 (1974).[1] The SSA's Claims Manual, an internal Administration handbook, instructs field representatives to advise applicants of the advantages of filing written applications and to recommend to applicants who are uncertain about their eligibility that they file written applications. Connelly, however, did not recommend to respondent that she file a written application; nor did he advise her of the advantages of doing so. The question is whether Connelly's erroneous statement and neglect of the Claims Manual estop petitioner, the Secretary of Health and Human Services, from denying retroactive benefits to respondent for a period in which she was eligible for benefits but had not filed a written application.

Respondent eventually filed a written application after learning in May 1975 that in fact she was eligible. She then began receiving benefits. Pursuant to § 202 (j)(1) of the Act,[2] she also received retroactive benefits for the preceding

[1] This regulation has been recodified and now appears at 20 CFR §§ 404.602–404.614 (1980).

[2] This section provides, in pertinent part:

"An individual who would have been entitled to a benefit under subsectio[n] . . . (g) . . . of this section for any month after August 1950 had he

12 months, which was the maximum retroactive benefit allowed by the Act. Respondent contended, however, that she should receive retroactive benefits for the 12 months preceding her June 1974 interview with Connelly. An Administrative Law Judge rejected this claim, concluding that Connelly's erroneous statement and neglect of the Claims Manual did not estop petitioner from determining respondent's eligibility for benefits only as of the date of respondent's written application. The Social Security Appeals Council affirmed.

Respondent then brought this lawsuit in the District Court for the District of Vermont,[3] which held that the written-application requirement was "unreasonably restrictive" as applied to the facts of this case. A divided panel of the Court of Appeals for the Second Circuit affirmed. 619 F. 2d 942 (1980). It agreed with petitioner as an initial matter that the regulation requiring a written application is valid and that the Claims Manual has no legally binding effect. But it considered the written-application requirement a mere "procedural requirement" of lesser import than the fact that respondent in June 1974 had been "substantively eligible" for the benefits. *Id.*, at 948. In such circumstances, the majority held, "misinformation provided by a Government official combined with a showing of misconduct (even if it does not rise to the level of a violation of a legally binding rule) should be sufficient to require estoppel." *Ibid.* In summarizing its holding, the majority stated that the Government may be estopped "where (a) a procedural not a substantive requirement is involved and (b) an internal procedural manual or guide or some other source of objective

filed application therefor prior to the end of such month shall be entitled to such benefit for such month if he files application therefor prior to the end of the twelfth month immediately succeeding such month. . . ." 42 U. S. C. § 402 (j) (1).

[3] Judicial review of final decisions by the Secretary is authorized by 42 U. S. C. § 405 (g).

standards of conduct exists and supports an inference of misconduct by a Government employee." *Id.,* at 949.

Judge Friendly dissented. He argued that the majority's conclusion is irreconcilable with decisions of this Court, *e. g., Federal Crop Insurance Corp.* v. *Merrill,* 332 U. S. 380 (1947); *Montana* v. *Kennedy,* 366 U. S. 308 (1961); *INS* v. *Hibi,* 414 U. S. 5 (1973) (*per curiam*), and with decisions of other Courts of Appeals, *Leimbach* v. *Califano,* 596 F. 2d 300 (CA8 1979); *Cheers* v. *Secretary of HEW,* 610 F. 2d 463 (CA7 1979).

We agree with the dissent. This Court has never decided what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations governing the distribution of welfare benefits. In two cases involving denial of citizenship, the Court has declined to decide whether even "affirmative misconduct" would estop the Government from denying citizenship, for in neither case was "affirmative misconduct" involved. *INS* v. *Hibi, supra,* at 8–9; *Montana* v. *Kennedy, supra,* at 314–315. The Court has recognized, however, "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Federal Crop Insurance Corp.* v. *Merrill, supra,* at 385. Lower federal courts have recognized that duty also, and consistently have relied on *Merrill* in refusing to estop the Government where an eligible applicant has lost Social Security benefits because of possibly erroneous replies to oral inquiries. See *Leimbach* v. *Califano, supra,* at 304–305; *Cheers* v. *Secretary of HEW, supra,* at 468–469; *Goldberg* v. *Weinberger,* 546 F. 2d 477, 481 (CA2 1976), cert. denied, 431 U. S. 937 (1977); *Simon* v. *Califano,* 593 F. 2d 121, 123 (CA9 1979); *Parker* v. *Finch,* 327 F. Supp. 193, 195 (ND Ga. 1971); *Flamm* v. *Ribicoff,* 203 F. Supp. 507, 510 (SDNY 1961). This is another in that line of cases,[4] for we

---

[4] JUSTICE MARSHALL cites several cases in which federal courts have applied estoppel against the Government. *Post,* at 791. In some of the

are convinced that Connelly's conduct—which the majority conceded to be less than "affirmative misconduct," 619 F. 2d, at 948—does not justify the abnegation of that duty.

Connelly erred in telling respondent that she was ineligible for the benefit she sought. It may be that Connelly erred because he was unfamiliar with a recent amendment which afforded benefits to respondent. *Id.,* at 947. Or it may be that respondent gave Connelly too little information for him to know that he was in error. *Id.,* at 955 (Friendly, J., dissenting). But at worst, Connelly's conduct did not cause respondent to take action, cf. *Federal Crop Insurance Corp.* v. *Merrill, supra,* or fail to take action, cf. *Montana* v. *Kennedy, supra,* that respondent could not correct at any time.

Similarly, there is no doubt that Connelly failed to follow the Claims Manual in neglecting to recommend that respondent file a written application and in neglecting to advise her of the advantages of a written application. But the Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA. Rather, it is a 13-volume handbook for internal use by thousands of SSA employees, including the hundreds of employees who receive untold numbers of oral inquiries like respondent's each year. If Connelly's minor breach of such a manual suffices to estop petitioner, then the Government is put "at risk that every alleged failure

cases, the Government had entered into written agreements which supported the claim of estoppel. *E. g., United States* v. *Lazy FC Ranch,* 481 F. 2d 985, 990 (CA9 1973); *Walsonavich* v. *United States,* 335 F. 2d 96, 100–101 (CA3 1964). In others, estoppel did not threaten the public fisc as estoppel does here. *E. g., Semaan* v. *Mumford,* 118 U. S. App. D. C. 282, 284, and n. 6, 335 F. 2d 704, 706, and n. 6 (1964). In another, a bank claiming estoppel had erred in certain applications because it had to file before the Government would provide it with necessary information. *United States* v. *Fox Lake State Bank,* 366 F. 2d 962 (CA7 1966). We need not consider the correctness of these cases. We do think that they are easily distinguishable from the type of situation presented in this case and the line of cases we rely upon above.

by an agent to follow instructions to the last detail in one of a thousand cases will deprive it of the benefit of the written application requirement which experience has taught to be essential to the honest and effective administration of the Social Security Laws." 619 F. 2d. at 956 (Friendly, J., dissenting). See *United States* v. *Caceres*, 440 U. S. 741, 755–756 (1979).[5]

Finally, the majority's distinction between respondent's "substantiv[e] eligib[ility]" and her failure to satisfy a "procedural requirement" does not justify estopping petitioner in this case. Congress expressly provided in the Act that only one who "has filed application" for benefits may receive them, and it delegated to petitioner the task of providing by regulation the requisite manner of application. A court is no more authorized to overlook the valid regulation requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits.

In sum, Connelly's errors "fal[l] far short" of conduct which would raise a serious question whether petitioner is estopped from insisting upon compliance with the valid regulation. *Montana* v. *Kennedy, supra,* at 314. Accordingly, we grant the motion of respondent for leave to proceed *in*

---

[5] The contention was made in *Caceres* that a violation of an internal IRS regulation concerning electronic eavesdropping should result in exclusion from trial of the evidence obtained by such eavesdropping. In rejecting this contention, we noted that such a *per se* rule "would take away from the Executive Department the primary responsibility for fashioning the appropriate remedy for the violation of its regulations. But since the content, and indeed the existence, of the regulations would remain within the Executive's sole authority, the result might well be fewer and less protective regulations. In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form." 440 U. S., at 755–756.

*forma pauperis* and the petition for certiorari and reverse the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

A summary reversal is a rare disposition, usually reserved by this Court for situations in which the law is settled and stable, the facts are not in dispute, and the decision below is clearly in error. Because this is not such a case, I dissent from the majority's summary reversal of the judgment of the Court of Appeals, and would instead grant the petition and set the case for plenary consideration.

The issue here is important, not only in economic terms to respondent Hansen, but in constitutional terms as well. The question of when the Government may be equitably estopped has divided the distinguished panel of the Court of Appeals in this case, has received inconsistent treatment from other Courts of Appeals, and has been the subject of considerable ferment. See, *e. g., Corniel-Rodriguez* v. *INS*, 532 F. 2d 301 (CA2 1976); *United States* v. *Lazy FC Ranch*, 481 F. 2d 985 (CA9 1973); *United States* v. *Fox Lake State Bank*, 366 F. 2d 962 (CA7 1966); *Walsonavich* v. *United States*, 335 F. 2d 96 (CA3 1964); *Simmons* v. *United States*, 308 F. 2d 938 (CA5 1962); *Semaan* v. *Mumford*, 118 U. S. App. D. C. 282, 335 F. 2d 704 (1964); *Eichelberger* v. *Commissioner of Internal Revenue*, 88 F. 2d 874 (CA5 1937). See generally K. Davis, Administrative Law of the Seventies § 17.01 (1976); Note, Equitable Estoppel of the Government, 79 Colum. L. Rev. 551 (1979). Indeed, the majority today recognizes that "[t]his Court has never decided what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations governing the distribution of welfare benefits." *Ante,* at 788. The majority goes on to suggest that estoppel may be justified in some circumstances. Yet rather than address the issue in a compre-

hensive fashion, the Court simply concludes that this is not such a case.[1] The apparent message of today's decision—that we will know an estoppel when we see one—provides inadequate guidance to the lower courts in an area of the law that, contrary to the majority's view, is far from settled.

Indeed, the majority's attempt to distinguish conflicting decisions of other courts itself demonstrates the impropriety of today's summary disposition. The majority declines to "consider the correctness of these cases" and instead simply notes that they are distinguishable on their facts from the present case. *Ante,* at 789, n. 4. Yet the majority fails to explain why or how these purported factual distinctions affect the legal question of when the Government may be equitably estopped. Thus, the lower courts are left guessing whether the factual differences cited by the majority are of any real consequence. For example, the majority distinguishes *Semaan* v. *Mumford, supra,* on the ground that "estoppel did not threaten the public fisc." *Ante,* at 789, n. 4. Even accepting this characterization as correct,[2] I am unable to discern from the majority's opinion why the rules governing estoppel should differ depending on whether the party as-

---

[1] Ironically, the central case relied on by the majority today, *INS* v. *Hibi,* 414 U. S. 5 (1973), was also a *per curiam* decision rendered without the benefit of briefing and oral argument. Moreover, in that case the applicant applied for the sought-after benefit—naturalization—20 years after his substantive eligibility had expired, and the claim of estoppel arose solely from an alleged general failure of the Government to adequately inform noncitizens who served with the Armed Services of the United States during World War II of their possible eligibility for naturalization. Here, in contrast, respondent was eligible for the benefits at the time of her interview with Connelly and the claim of estoppel here arises from Connelly's specific failures to answer correctly her questions concerning eligibility and to encourage her to file an application.

[2] In *Semaan,* the benefit ultimately sought by the party claiming estoppel was reinstatement in the job from which he was discharged. Thus, I believe that the majority errs in claiming that the estoppel "did not threaten the public fisc." *Ante,* at 789, n. 4.

serting an estoppel seeks monetary benefits from the Government instead of some other form of Government action or inaction. Similarly, the majority distinguishes *United States v. Fox Lake State Bank, supra,* on the ground it involved a claim of estoppel by "a bank [that] had erred in certain applications because it had to file before the Government would provide it with necessary information." *Ante,* at 789, n. 4. I trust that the majority does not intend to suggest that a claim of estoppel is more likely to prevail when raised by a bank rather than by a person eligible for Social Security benefits, but I do not believe that the majority's other basis for distinguishing that case—that the Government failed to provide the information necessary to file correct applications—is substantively different from the Government's failure in this case to supply respondent with correct information when she sought to apply for benefits. The third distinction offered by the majority—one that apparently differentiates between written statements by the Government and oral ones—might be relevant to the proof of the Government's conduct in some cases. However, estoppel against the Government has not been restricted in the past to written misrepresentations, see, *e. g., Simmons* v. *United States, supra,* and today's decision leaves unclear whether or when such a limitation will apply in the future. Thus, I believe that the majority, in its haste to reverse the judgment of the Court of Appeals, has simply added confusion to an already unsettled area by hinting, but not deciding, that various factual nuances may be dispositive of estoppel claims against the Government.

Moreover, in summarily reversing the judgment of the Court of Appeals, the majority glosses over the sorts of situations—such as that presented by this case—that have increasingly led courts to conclude that in some cases hard and fast rules against estoppel of the Government are neither fair nor constitutionally required. The majority characterizes Connelly's conduct in this case as little more than an innocent mistake, based possibly on his unfamiliarity with a "recent

amendment" rendering respondent eligible for benefits, or possibly, the majority speculates, on respondent's failure to give Connelly sufficient "information . . . to know that he was in error." *Ante,* at 789. The majority further concludes that this error was essentially harmless, because, in the majority's view, it "did not cause respondent to . . . fail to take action . . . that respondent could not correct at any time." *Ibid.*

While these characterizations certainly facilitate the summary disposition the majority seeks, they do not fit this case. The "recent amendment" had been in effect for a year and a half when respondent was incorrectly informed that she was not eligible. Moreover, it is quite clear that respondent provided Connelly with sufficient information on which to make a correct judgment, had he been so inclined.[3] Finally, to conclude that Connelly's incorrect assessment of respondent's eligibility did not cause her to act to her detriment in a manner that she "could not correct at any time" is to blink in the face of the obvious. Connelly, and not respondent, had the legal duty to meet with Social Security applicants and advise them concerning their eligibility for benefits. While not necessarily free of error, such preliminary advice is inevitably accorded great weight by applicants who—like respondent—are totally uneducated in the intricacies of the Social Security

---

[3] The apparent basis for the majority's speculation that respondent may not have informed Connelly of all the relevant facts is Judge Friendly's assertion, in dissent, that Connelly did not know that respondent's husband had died. This view is wholly implausible. Respondent asked Connelly whether she was eligible for mother's insurance benefits. These benefits are *only* available to persons whose spouses have died, 42 U. S. C. § 402 (g), a fact that must have been known to Connelly. It is clear from the record that Connelly assumed that respondent's husband had died, and instead focused his questions on respondent's marital status at the time of her husband's death, in the mistaken belief that she would be ineligible if she was divorced at that time. Thus, respondent testified before the Administrative Law Judge that Connelly "said I was not [eligible] because I was divorced *at the time of my husband's death.*" App. to Brief in Opposition 2a. (Emphasis added.)

laws. Hence, the majority's effort to cast respondent as the architect of her own predicament is wholly unpersuasive. Instead, the fault for respondent's failure to file a timely application for benefits that she was entitled to must rest squarely with the Government, first, because its agent incorrectly advised her that she was ineligible for benefits, and, second, because the same agent breached his duty to encourage to file a written application regardless of his views on her eligibility.

In my view, when this sort of governmental misconduct directly causes an individual's failure to comply with a purely procedural requirement established by the agency, it may be sufficient to estop the Government from denying that individual benefits that she is substantively entitled to receive. Indeed, in an analogous situation, we concluded that before an agency "may extinguish the entitlement of . . . otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures." *Morton* v. *Ruiz*, 415 U. S. 199, 235 (1974). At the very least, the question deserves more than the casual treatment it receives from the majority today.