**Manuel Ramos APONTE, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. No. 83–1286 (JP).**

United States District Court, D. Puerto Rico.

Jan. 31. 1984.

Alvaro R. Calderon, Calderon, Rosa-Silva & Vargas, Hato Rey, P.R., for plaintiff.

Eduardo E. Toro-Font, Asst. U.S. Atty., Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

This action is brought forth under Title 28 United States Code, Section 1346(b) and the Federal Tort Claims Act, Title 28 United States Code, Section 2671, et seq., seeking relief for personal injury allegedly caused by the negligent or wrongful acts or omissions of employees of the United States Government while acting within the scope of their office or employment. The negligence alleged consists in that employees of defendant removed plaintiff's testicle without his prior informed consent, i.e. without that of his tutor, co-plaintiff, his. wife. The damages alleged consist in physical and emotional suffering and mental anguish.

The defendant answered the complaint admitting jurisdiction and the timeliness of the filing of the complaint. Although defendant accepts that the surgery was performed, it denies that it was performed without plaintiff's prior informed consent.

The case was tried on December 12, 1983. At that time, the parties presented evidence to sustain their contentions. After hearing the evidence and the initial allegations of the parties and final positions contained in the Pre-trial Order, the Court enters the following FINDING OF FACTS:

1. This Court has jurisdiction under Title 28 U.S.Code, Section 1346(b) and the Federal Tort Claims Act, Title 28 U.S.Code, Section 2671, et seq.

2. Plaintiff, Manuel Ramos Aponte, is a 53 year old Korean War veteran married to Aleja Ortiz de Ramos. The couple have four children and plaintiff receives pension benefits from the Veterans Administration. (Plaintiff's Exhibit 1).

3. Mrs. Ramos has always received these benefits in a fiduciary capacity for her husband, as the Veterans Administration has instructed her upon incapacitating her husband on October 8, 1969. (Plaintiff's Exhibit 1).

4. The plaintiff suffers from schizophrenia, undifferentiated type, as diagnosed in 1963 by Veterans Administration doctor, Dr. Fernández Marina. The findings of Dr. Fernández Marina, dated February 23, 1963, are outlined in Exhibit 24, a narrative summary stating *inter alia* as follows: "Fund of information and intellectual capacities are handicapped. No insight poor judgment." The diagnosis concludes:

"Schizophrenic reaction, undifferentiated type, acute, moderate; as manifested by autism, ambivalence, disturbances in thought processes and affectivity, auditory and visual hallucinations, bizarre behavior, suicidal-homicidal ideas, weeping spells, poor judgment and insight (in remission of acute symptoms)."

5. The plaintiff has been hospitalized at the Veterans Administration Hospital at least nineteen times. His hospitalizations have included a tonsillectomy in 1961, the removal of a neural arch in 1968, a varicose vein operation in 1975, treatment of an ulcer in 1976 and several hospitalizations for his schizophrenia, undifferentiated type.

6. The psychiatrist who testified for defendant at the trial stated that, in view of Dr. Fernández Marina's findings at the time, plaintiff was unable to freely exercise his will and give his consent to anything. He explained that schizophrenia is curable in about one-third of the cases, but this normally happens in a period of ten months. The plaintiff was not cured as he continued to suffer bouts of this mental disease; as a matter of fact, the last one was after the surgery in the case at bar. All these facts appear from the medical records available to the doctors who intervened in the decision to operate.

7. The hospitalization, subject of this suit involves an operation performed on November 5, 1981 for exploration of a testicle with possible removal of the same.

8. All findings as to schizophrenia and further hospitalization for said disease caused the Veterans Administration to conclude that Manuel Ramos was incapacitated and unable to administer his own affairs because of this mental condition. His wife, co-plaintiff, Aleja Ortiz de Ramos was appointed tutrix of Manuel and all correspondence to him was addressed to her as tutrix. The Veterans Administration always paid her a per diem and traveling expenses whenever she had to bring him to the Hospital.

9. On October 1, 1981, the plaintiff signed a consent form, and underwent a left epididymal mass exploration of the left scrotal with an excision of a spermatic cord mass. This was found to be benign.

10. Nothing else is usually done in these situations, but the patient complained of having great pain. The patient developed a large painful spermatic cord mass which was swollen and had to be explored. It was medically convenient to remove the left testicle.

11. On November 4, 1981, plaintiff was taken to the Urology Clinic of the Veterans Administration Hospital. Dr. Antonio Puras, Chief of the Urology Clinic, explained to plaintiff, in detail, the procedure and possible complications. Dr. Puras explained that the tumor mass which was excised in October was a benign tumor. (Adematoid tumor).

12. These explanations were given to Manuel Ramos by Dr. Puras upon admission to the hospital; it was also explained to him while in the ward and on the day before the operation. Dr. Puras never read the schizophrenia reports and admitted while testifying that he could not give a psychiatric opinion as to plaintiff's mental condition because his studies were very superficial.

13. Plaintiff signed a consent form issued by the Veterans Administration Hospital. (Defendant's Exhibit A). Plaintiff's wife was not informed of the possible risks and the possibility that a testicle would be removed. Her consent was not requested.

14. The operation was performed on November 5, 1981 and the next day plaintiff had a strong emotional reaction. He had to be tied to the bed. Plaintiff became more depressed. The plaintiff suffered from anxiety as a result of the surgery and the deflated look of the sac.

15. Thereafter, an artificial testicle was inserted inside the sac and cosmetically he was as before the operation. The plaintiff has continued to be depressed as a result of the partial castration performed on him.

## CONCLUSIONS OF LAW

### A) *Informed Consent*

The main issue for consideration is whether the plaintiff could have given an informed consent to the operation. Our legal analysis commences on the lack of informed consent obtained from the tutrix and on the estoppel of the Veterans Administration Hospital in denying that Mrs. Ramos is the tutrix. It is essential that informed consent be obtained before a patient is operated on. If the patient is not mentally competent to render this, consent must be obtained from the guardian or next of kin. *Rojas v. Maldonado*, 68 P.R.R. 757, (1948) stands for the jurisprudence in Puerto Rico treating the informed consent which a patient or guardian must give a physician before the latter operates. The Puerto Rico Supreme Court stated in Rojas at 765 as follows:

> The general rule laid down by the American state decisions is that the relationship between a physician and his patient is a consensual one, and in the absence of an emergency or unforeseen events, a physician or surgeon must first obtain the consent of the patient, or of some one legally authorized to give it on his behalf, before subjecting him to any treatment or operation. It has been held that the consent of the patient is necessary in order to authorize a surgeon to perform

an operation on the body of said patient, and that an operation performed without such consent is a tortious and illegal act which renders the surgeon liable for any damages caused to the patient.

The facts show that the VA never obtained an informed consent from the wife, the plaintiff's tutrix. Plaintiff contends that the informed consent of his wife as tutrix was essential considering that he had been found to be a totally disabled schizophrenic with very serious emotional and mental problems, all of which were known or should have been known by the Veterans Administration physicians. Furthermore, the VA never took the interest of explaining the extent and nature of the surgery to the wife. Instead, the VA hospital obtained the signature of the schizophrenic patient. This is aggravated by the fact that this same patient had been adjudged totally disabled by the Veterans Administration itself and his wife named as the tutrix.

The Veterans Administration argues that Mrs. Aleja Ortiz de Ramos is not the legal representative or tutrix because Section 17.34 of the Code of Federal Regulations defines a "legally authorized representative" in the following manner:

"legally authorized representative means an individual, organization, or other judicially recognized body empowered under the applicable state law to act on behalf of a legally incompetent individual."

The defendant then contends that the applicable state law in Puerto Rico is found in Section 703, Title 31 of the Laws of Puerto Rico Annotated, which provide that:

"A tutor shall not be appointed for insane, demented and deaf and dumb persons when of age, without a previous decree on the part of the Superior Court of their domicile that they are, incapable of administering their property."

Thus, defendant concludes that Mrs. Aleja Ramos was not a judicially determined tutrix as outlined by the law in Puerto Rico and, as such, the Veterans Administration had no duty or obligation to inform her on the details of her husband's surgery. The Veterans Administration states that the plaintiff, Manuel Ramos Aponte, possessed sufficient mental capacity to understand the details of the operation. Defendants cite the case of *Rivera v. Heirs of Díaz*, 70 P.R.R. 168, 175 (1949) for the proposition that,

"the rule to be followed in civil cases is to determine whether the party, mentally ill by reason of his disease, has sufficient mental capacity to understand the particular transaction before him, considered in all its aspects. The party may be insane from the standpoint of the psychiatrist, and yet be mentally competent to understand the scope of a particular transaction. Hence Section 180 of the Civil Code, in dealing with the tutorship of insane persons, provides that a tutor shall not be appointed for insane or demented persons, when of age, without a previous declaration that they are incapable of administering their property. This logic implies that a tutor may not be appointed for an insane person who is competent to administer his property. If the statute prohibits the appointment of a tutor for a person who is competent to administer his property, we must conclude that this is so because it recognizes his legal capacity to contract."

The Veterans Administration not only concludes that plaintiff could consent, but that he did so in an informed manner. Additionally, the Veterans Administration cites the doctrine that since a person is presumed mentally sane, "the burden of proof is on the person who alleges the disability if the other party denies it." *Torres v. W.R.A.*, 96 P.R.R. 634, 638 (1968). Therefore, plaintiff must be demonstrated by a preponderance of the evidence that he was mentally incapacitated at the time his consent was obtained.

 The Court finds that the plaintiff has demonstrated that he lacks and lacked the necessary mental capacity to render an informed consent on the operation. Plaintiff's Exhibit 24, stipulated by the parties, is a narrative summary signed by Dr. R.

Fernández Marina dealing with the plaintiff's stay in the Veterans Administration hospital from January 13, 1963 until his discharge in February 23, 1963. The clinical record shows:

"Schizophrenic reaction, undifferentiated type, acute, moderate; as manifested by autism, ambivalence, disturbances in thought processes and affectivity, auditory and visual hallucinations, bizarre behavior, suicidal-homicidal ideas, weeping spells, poor judgment and insight (In remission of acute symptoms)."

The plaintiff was also prescribed an increase of 600 mg. of Thorazine, a drug for schizophrenia. Exhibit 16 is a consultation sheet showing that the patient has a history of schizophrenia reactions since 1956 and said Exhibit makes reference to plaintiff's multiple hospitalizations at the Veterans Administration Hospital. Exhibit 26 also indicates that not only was he suffering from schizophrenia, but that the VA medical records show that his disease is continuous and concurrent. The Veterans Administration never recommended that the wife go to Court to declare her husband an incompetent, but instead, led her to believe that he already was an incompetent. Medical practice on the part of the Veterans Administration Hospital required them to check plaintiff's record well; his mental condition should have been familiar to them and a sensitive genital operation especially mandated this.

In his book, *Physician and Patient*, Harry J. Grayson, New York, 1971, Chap. 5, dealing with Informed Consent-Consent to Medical and Surgical Procedures, it is stated that "in cases of doubt as to the mental competency of a patient to give his consent to surgical procedures, consent should be obtained for a relative capable of giving it." This book is cited as an established authority and invites the Court's attention to pages 5–10, where it is printed: "Of course, where the mental competency of a patient to give consent to surgical procedure is doubtful, consent to such procedure must be obtained from a near relative capable of giving consent." Consent from the wife was never obtained. It would have been quite easy for the Veterans Administration to inform the wife. There are no compelling reasons cited by the defendant to the effect that plaintiff's operation was under any emergency conditions or knowledge of the risks involved would have made him more apprehensive in undergoing surgery. *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968). To the contrary, the Veterans Administration Hospital was negligent in operating without proper consent from the tutrix and in not reading the plaintiff's medical file.

B) *Estoppel*

The Veterans Administration argues that plaintiff, Ramos had not been adjudged incapacitated and as such had no guardian appointed in accordance with 31 Laws of Puerto Rico Annotated, Section 862 which reads as follows:

"Whenever, pursuant to any law of the United States or regulation of the Administration, the Administrator requires, prior to payment of benefits, that a guardian be appointed for a ward, such appointment shall be made in the manner hereinafter provided."

The subsequent section, Section 863 of Title 31 L.P.R.A. states:

"A petition for the appointment of a guardian may be filed in any court of competent jurisdiction by or on behalf of any person who is entitled to priority of appointment ... In the case of a mentally incompetent ward, the petition shall show that such ward has been rated incompetent on examination by the Administration in accordance with the laws and regulations governing the Administration."

The Court considers this argument unpersuasive because the Veterans Administration Hospital, through its personnel, had examined plaintiff, found him disabled and had treated him extensively for his schizophrenic condition (Exhibits 16, 23 and 26), his nervousness (Exhibits 19 and 20), his depression (Exhibit 14), and his mental disorders (Exhibit 25). The Veterans Ad-

ministration is, therefore, *estopped* from claiming that (a) plaintiff could render an informed consent; and (b) that his wife's consent was unnecessary since she is not his tutrix because the VA did not institute procedures before the state court in accordance with 31 L.P.R.A. Section 863.[1]

The laws of estoppel against an agency of the United States is in dynamic flux. The case of *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) originally provided no estoppel against the government because "whatever the form in which the Government functions, anyone entering into an arrangement with the Government, takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority ... And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority."

Nonetheless, the case of *Moser v. United States*, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951) applied what has been interpreted as estoppel against the government. The plaintiff Moser applied for U.S. citizenship, even though he had claimed exemption from military service as a neutral Swiss alien, and even though the Selective Service Act barred him from citizenship. Moser was led to believe that by signing a form applying for exemption from military, "you will not waive your right to apply for American citizenship papers." The Supreme Court never used the word estoppel, but reversed and held for Moser stating:

> "Petitioner had sought information and guidance from the highest authority to which he could turn, and was advised to sign Revised Form 301. He was led to believe that he would not thereby lose his rights to citizenship. If he had known otherwise, he would not have claimed exemption. In justifiable reliance on this advice he signed the papers sent to him

by the legation ... Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness." *Moser*, at 46–47, 71 S.Ct. at 555–556.

The Supreme Court in *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), was faced with a factual situation whereby a field representative of the Social Security Administration erroneously informed the applicant as to her ineligibility. One year later, the applicant reapplied and was eventually awarded the benefits, but the issue remained as to her lost benefits. The Second Circuit granted her the lost benefits and the Supreme Court reversed, citing *Merrill, supra*. The U.S. Supreme Court did not say that the government may never be estopped, but rather held that, "this Court has never decided what type of conduct by a government employee will estop the government from insisting upon compliance with valid regulations governing the distribution of welfare benefits... The Court has recognized, however, 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury'". *Hansen*, at 788, 101 S.Ct. at 1471. The dissent of Justice Marshall, joined by Justice Brennan, better expresses the reasoning in the case at bar for it was expressed that "In my view, when this sort of governmental misconduct *directly causes* an individual's failure to comply with a purely procedural requirement established by the agency, it may be sufficient to estop the Government from denying ... individual benefits that she is entitled to receive." *Hansen*, at 795, 101 S.Ct. at 1474.

The status of the law of estoppel against the Government imposes on the lower courts to overrule the notion that the Government may never be estopped without clearly defining *when* there may be

---

**1.** We must make it clear, however, that the Court's decision is not necessarily based on this estoppel by the Administration. Regardless of whether plaintiff was adjudged incompetent by a Court, he was de facto mentally disabled as appears from the very same records of the VA Hospital, and common prudence mandated that his wife give her informed consent to the operation.

estoppel. In the factual situation of the instant case, Mrs. Aleja Ortiz de Ramos testified that she was not asked or permitted to sign the consent, she was not informed about the possible risks as she was kept in the dark. Furthermore, her testimony reveals that it was only on the morning after the operation when she realized that her husband's left testicle had been removed. This is precisely the type of governmental action which this Court finds persuasive for a finding of estoppel. The case of *Miranda v. INS,* 673 F.2d 1105 (9th Cir.1982) held for estoppel because of "affirmative misconduct" by its 18 month delay in acting on a visa petition. The Seventh Circuit in *Portmann v. United States,* 674 F.2d 1155 (7th Cir.1982) has also estopped the government when the postal clerk assured the plaintiff that his package was insured. The Circuit Court found "nothing in any of the Supreme Court decisions which clearly forecloses the availability of estoppel in the instant case." *Portmann,* at 1165. The case law formulating estoppel continues with the Court of Claims decision in *Broad Avenue Laundry and Tailoring v. United States,* 681 F.2d 746 (Ct.Cl.1982). Even after a reading of *Hansen, supra,* the Court of Claims estopped the government from denying a contracting officer's written modifications in a contract as "the government can be estopped by the promise of an official within the scope of her authority." *Broad Avenue Laundry and Tailoring,* at 747–48.

More importantly, the First Circuit in *Akbarin v. Immigration and Naturalization Service,* 669 F.2d 839 (1st Cir.1982) has held that the government may be estopped from deporting an Iranian student if the student proves that an INS official had orally authorized his employment. This post-*Hansen* decision distinguishes *Hansen* as not being "helpful here because the decision seems to rest to some degree on the fact that the estoppel 'threatened the public fisc.'" *Akbarin,* at 843. The First Circuit per Circuit Judge Bownes reasons that in finding for estoppel against the Government, the inquiry is two-pronged; namely

1) whether the Government's action was error, and if the complaining party reacted to the error;

2) whether the action was intended to or could reasonably have been intended to induce reliance.

Following the First Circuit's two-pronged analysis, the Government's action was in error; the Veterans Administration had known of plaintiff's condition. Secondly, the plaintiff and wife were induced to believe in their ward-guardian relationship before the agency. Adhering to the reasoning of *Miranda, Portmann, Broad Avenue Laundry* and *Akbarin,* whereby the government may be estopped, this Court holds that governmental misconduct exists and, as such, the Government is estopped from asserting that the plaintiff could render an informed consent, that the plaintiff had not been judicially declared an incompetent by the state court, and that as such his wife's consent as tutrix was not necessary.

It is undisputed that the Veterans Administration, besides having knowledge of plaintiff's incapacity, took affirmative steps in issuing a statement of incapacity and appointed plaintiff's wife to act on her husband's behalf. (Plaintiff's Exhibit 1).

The plaintiff's wife was informed for all practical purposes that she was a tutrix; the letter dated October 8, 1969 was VA's adjudgment of Ramos' incapacity and appointment of his wife to handle plaintiff's pension benefits. The wife was told by the Veterans Administration that, due to plaintiff's incapacity, she would have to handle his affairs. Plaintiff, Ramos had been incapacitated by the VA precisely because he could not give his informed consent and therefore, consent had to be given by his wife. She was never asked to give her consent. All these facts appeared from Ramos' medical records with the VA and knowledge of these facts is imputed to all VA personnel, including the nurses and doctors who dealt with this surgery and failed to obtain the wife's consent.

■ If the plaintiff is known to be incapable of giving consent because of mental incompetence as is the case here, his failure to object, or even his active manifestation of consent will not protect the defendant. W. Prosser, Law of Torts, § 18 (4th ed. 1971). Such a failure constitutes negligence on the part of the personnel of the VA. Therefore, the Veterans Administration Hospital is liable for damages which the plaintiff alleges as mental anguish. In assessing the damages the Court takes into account that the surgery eliminated much of plaintiff's previous adverse physical conditions. Surgery prevented further growth of the tumor, eased and eliminated pain in the testicle; also the implant of the artificial testicle did away with the stressful cosmetic condition. The damages remain as to the pain and suffering of surgery, mental anguish and the anxiety experienced because of the cosmetic condition resulting after the surgery which has been repaired.

For the reasons above stated, the Court assesses the damages as Nine Thousand Dollars ($9,000.00) for plaintiff, Manuel Ramos Aponte, and One Thousand Dollars ($1,000.00) for his wife, Aleja Ortiz de Ramos.

IT IS SO ORDERED.