**CHIEN–SHIH WANG, Plaintiff,**

v.

**ATTORNEY GENERAL OF the
UNITED STATES, et al.,
Defendants.**

No. 82–0536–CV–W–9.

United States District Court,
W.D. Missouri, W.D.

May 16, 1986.

Robert Frager, Kansas City, Mo., for plaintiff.

Linda L. Sybrant, Asst. U.S. Atty., Kansas City, Mo., for defendants.

## ORDER

BARTLETT, District Judge.

On June 29, 1982, plaintiff filed a complaint against the Attorney General of the United States and the District Director of the Immigration and Naturalization Service (INS) requesting a declaratory judgment that defendants process plaintiff's application for status as a permanent resident pursuant to 8 U.S.C. § 1255b(b) as that statute read prior to its amendment in 1981.

## FACTS

On February 15, 1975, plaintiff was admitted to the United States under a diplomatic visa Class A–1. Plaintiff was assigned as a Consular Officer to the Consular Office in Kansas City, Missouri, of the Republic of China (Taiwan).

In early 1979, after the United States recognized communist China, Taiwan closed its Consular Office in Kansas City and recalled plaintiff to Taiwan. Desiring to remain in the United States, plaintiff went to the INS office in Kansas City (INS Kansas City) and inquired about staying in the United States. He talked with an unidentified officer who advised him that the filing of an application under § 13 of the Immigration and Nationality Act of September 11, 1957, 8 U.S.C. § 1255b(b),[1] was

provided as follows:

---

1. Section 13 as codified in 8 U.S.C. § 1255b(b)

the only possible way for plaintiff to stay in this country. Plaintiff was given four sets of forms to submit, one for each member of his family. The parties agree that plaintiff was not eligible under any other provision to gain permanent resident status.

On March 23, 1979, plaintiff took the completed forms to the INS office in Kansas City. At that time he tendered for filing not only the application for permanent resident status but also all other required forms, including required household registration information, and birth certificates for each member of his family. In accordance with its policies, INS Kansas City reviewed the tendered application to ensure that all required documentation was present. The application was accepted and plaintiff paid the required filing fee. The application would not have been accepted if it had not been complete.[2]

Although INS's operations instructions required that the Kansas City office should "promptly upon receipt of the application" submit requests for verification of diplomatic status to the Department of State, this was not done until July 5, 1979, three and one-half months after the application was filed. Five months thereafter, the Department of State verified plaintiff's diplomatic status and indicated that it did "not have an objection to the granting of the subject's application for adjustment of status under Section 13 of the act of September 11, 1957."

Over three months after the State Department verified plaintiff's status, plaintiff was notified by INS Kansas City to appear on March 26, 1980, for an appointment regarding his application for permanent residence and to bring with him his passport and visa. At the March 26, 1980,

interview, plaintiff was given Form I–72 which instructed plaintiff and his family to obtain medical examinations and to return the medical forms to INS Kansas City as soon as they were completed. The I–72 Form had a series of alternative instructions such as furnishing a birth certificate or marriage certificate which plaintiff was not requested to do.

The medical examination was completed on April 25, 1980, and plaintiff promptly delivered the results to INS Kansas City. On May 6, 1980, plaintiff's § 13 application, together with his wife's and children's files, was forwarded to the Washington district office. On August 25, 1980, the Washington district office returned plaintiff's § 13 applications "for further information needed for our decision. See attached Section 13 worksheet. Please expedite." It is impossible to tell from the § 13 worksheet what further information the Washington district office required.

Approximately nine months later on May 28, 1981, plaintiff received another Form I–72 (the same form that was used to request the medical examination one year before) requesting that he furnish a birth certificate for each member of the family, a marriage certificate and a Summary Translation in English of Any Foreign Document. Paragraph 17 of this notice stated:

> This office has still not received the documents requested at the time of interview. Please have all members of your family complete the enclosed Forms I–508. A certified copy of your marriage certificate and a birth certificate for each of you is needed. You have 30 days in which to submit these documents before your applications are deemed abandoned for a lack of prosecution.

If, after consultation with the Secretary of State, it shall appear to the satisfaction of the Attorney General that the alien is a person of good moral character, that he is admissible for permanent residence under this chapter, and that such action would not be contrary to the national welfare, safety, or security, the Attorney General, in his discretion, may record the alien's lawful admission for permanent residence as of the date of the order of

the Attorney General approving the application for adjustment of status is made.

**2.** The 1981 administrative procedures for processing § 13 applications are found in Operations Instructions 245.8 (February 9, 1977) and in Processing Steps for Section 13 Applications, Joint Stipulation, Exhibit 1, filed February 19, 1985 (Document # 30).

This was the first time plaintiff had been advised that there was any deficiency in the March 23, 1979, application. Plaintiff called Mr. Thompson, the immigration officer who was handling his file at INS Kansas City, and told him that he had already submitted this information in 1979. Thompson replied that INS could not find the information in the file and requested that he submit it again. On June 15, 1981, plaintiff again delivered to INS Kansas City a Translation of Extract of Household Registration together with birth certificates and marriage certificate.

On June 17, 1981, INS Kansas City sent plaintiff's § 13 application to INS Washington, D.C., advising that all requested action had been completed.

Under the 1981 administrative procedures for processing § 13 applications, the District Director, Washington, D.C., was responsible for the adjudication of each application. If the District Director denied the application, the applicant was notified of the decision and of his right to appeal to the regional commissioner. If the District Director approved an application, the District Director then prepared and submitted to Congress the report required by § 1255b(c). Reports were submitted to Congress in chronological order determined by the date the application was received by INS. If Congress took adverse action on a § 13 adjustment case, the file was returned to the local office for appropriate action. If Congress did not take adverse action within the time allowed, the application for permanent residence was approved.

INS took no action on plaintiff's application until April 12, 1982. Specifically, the District Director did not adjudicate plaintiff's application. Had the District Di-

rector approved plaintiff's application between June 17, 1981, when plaintiff's § 13 application was forwarded to INS Washington, D.C. for a second time, and September 1981, the report on plaintiff's application would have been included with other reports that had been submitted to Congress in September 1981. (The original date of plaintiff's application was March 23, 1979.) The fifty applications reported to Congress in September 1981, were approved because the House of Representatives failed to take adverse action on them within the time allowed for Congressional action.

Effective December 29, 1981, the Immigration and Nationality Act Amendments of 1981 (1981 Amendments) changed § 1255b(b) to require that an applicant for adjustment of status must show compelling reasons demonstrating an inability to return to the home country and that the adjustment would be in the national interest.[3]

On April 21, 1982, the § 13 applications for plaintiff and his family were returned by the INS Washington district office to INS Kansas City with instructions to complete processing of the application pursuant to the 1981 Amendments. INS Kansas City was directed to advise plaintiff and his family that their applications were deficient because they did not comply with the 1981 Amendments.

On June 1, 1982, the INS District Director in Kansas City wrote plaintiff as follows:

The Immigration and Nationality Act Amendments of 1981 have substantially changed the evidence requirements for Applications for Adjustment of Status

---

3. After the 1981 amendments, § 1255b(b) stated as follows:

If, after consultation with the Secretary of State, it shall appear to the satisfaction of the Attorney General that the alien has shown compelling reasons demonstrating both that the alien is unable to return to the country represented by the government which accredited the alien or the member of the alien's immediate family and that adjustment of the alien's status to that of an alien lawfully ad-

mitted for permanent residence would be in the national interest, that the alien is a person of good moral character, the [sic] he is admissible for permanent residence under this chapter, and that such action would not be contrary to the national welfare, safety, or security, the Attorney General, in his discretion, may record the alien's lawful admission for permanent residence as of the date of the order of the Attorney General approving the application for adjustment to status is made.

under Section 13 of the Immigration and Nationality Act. An applicant must now submit evidence that he/she "... has compelling reasons for being unable to return to the country which he/she represented *and* that the adjustment of status would be in the national interest of the United States."

Your application does not contain such evidence. Accordingly you are hereby notified that you must submit such evidence to this office within thirty (30) days of this notice.

Failure to submit such evidence within the required 30 day period will cause your application to be terminated. Any required interviews will be scheduled on a future date. Appropriate notice will be given regarding these interviews.

Plaintiff did not submit evidence that he has compelling reasons for being unable to return to Taiwan as required by the 1981 Amendments to § 1255b(b). Therefore, plaintiff is a non-immigrant alien subject to deportation upon order of the Attorney General of the United States.

Based on the foregoing, the Court reaches the following factual conclusions: On March 23, 1979, plaintiff submitted a complete application for status as a permanent resident under § 13 of the Immigration and Nationality Act of September 11, 1957, 8 U.S.C. § 1255b(b). Thereafter, INS misplaced part of the application and attempted improperly to place the responsibility on the plaintiff for failing to comply with application procedures. Not only was the delay from March 23, 1979, when the application was filed with INS Kansas City, to June 17, 1981, when it was finally submitted in a completed form to INS Washington, caused by INS's misplacing of documents supporting the application, but also by unexplained and lengthy delays by INS in processing the application. If INS had proceeded with reasonable dispatch in processing plaintiff's application, it would have been completed and submitted to Congress prior to the 1981 Amendments to § 1255b(b). Had that happened, plaintiff's application would have been approved and he would now have permanent resident status in the United States.

## DISCUSSION

Plaintiff requests that defendants be estopped from imposing the requirements of 8 U.S.C. § 1255b(b), as amended in 1981, and that the Attorney General of the United States be ordered to promptly process plaintiff's application for status as a permanent resident under the provisions of the law existing prior to the 1981 Amendments to § 1255b(b). Plaintiff does not request that his name be submitted to Congress, noting that the Supreme Court has declared the Congressional veto provision in 8 U.S.C. § 1255b(c) to be unconstitutional. *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

Although neither the United States Supreme Court nor the Eighth Circuit Court of Appeals has stated that equitable estoppel can be applied against the Government, neither court has stated that it cannot. In fact, in a series of recent cases, the Supreme Court has suggested that there may be circumstances where some type of conduct by Government employees will estop the Government from denying a particular benefit or status. *See, e.g., Heckler v. Community Health Services of Crawford,* 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Immigration and Naturalization Service v. Miranda,* 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961). For instance, in *Community Health Services of Crawford, supra,* although the Court refused to estop the Government from recouping payments under the Medicare program even though the Government's claim for reimbursement resulted from erroneous advice given to the claimant by a fiscal intermediary, the Court nonetheless declined to impose a blanket

**1212**

prohibition against the use of estoppel against the Government:

> Petitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government. We have left the issue open in the past, and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor and reliability in their dealings with their Government.

104 S.Ct. at 2224 [footnotes omitted] [emphasis in original]. The Court noted that the hallmark of the doctrine of equitable estoppel is its flexible application to avoid injustice in particular cases. However,

> the party claiming the estoppel must have relied on its adversary's conduct "in such a manner as to change his position for the worse" and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.

*Id.* at 2223 [footnotes omitted].

In addition to these traditional elements of estoppel, something more must be shown to estop the Government from enforcing the law:

> When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well-settled that the Government may not be estopped on the same terms as any other litigant.... [H]owever heavy the burden might be when estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present.

104 S.Ct. at 2224 [footnote omitted]. The private party did not prevail because it did not demonstrate that the traditional elements of estoppel were present. *Id.* at 2224–27.

■ In the instant case, plaintiff's reliance on INS's conduct not only caused plaintiff to suffer detriment, but was also reasonable under the circumstances. On two separate occasions plaintiff complied with the INS's requirements to furnish information supporting his application. After having furnished all required information, plaintiff relied on INS to process his application in a reasonable and timely manner. Furthermore, plaintiff relied on INS to process his application in the same manner as similiary situated applicants. INS failed to process plaintiff's application in a reasonable and timely manner and failed to process it in the same manner as similarly situated applicants. There is no dispute that other § 13 applications filed at approximately the same time as plaintiff's were processed in ample time to be submitted to Congress in September, 1981. Nothing in this case suggests that any part of the over two year delay in the processing of plaintiff's application was plaintiff's fault. He responded promptly to each request made by INS. The conclusion is inescapable that in plaintiff's case the delay was unwarranted and unnecessary, even taking into account the workload of the INS.

Plaintiff's reliance on INS to process his application with reasonable promptness and in the same manner as other similarly situated applicants was entirely reasonable. Government should act with reasonable timeliness and should treat similarly situated people the same. Nothing in this situation suggests that plaintiff was negligent in remaining ignorant of the truth of what INS was doing. Even had he realized that he was being treated differently than other similarly situated applicants, there was nothing he could have done to avoid the consequences of INS's behavior. *Cf. Community Health Services of Crawford*, 104 S.Ct. at 2223 n. 10 (noting that estoppel cannot be claimed by a party who either

possesses knowledge of the truth concerning the material facts or has the means to acquire such knowledge with reasonable diligence.)

Moreover, plaintiff suffered an adverse change in status as a result of his reasonable reliance on and expectation that INS would process his application efficiently and equitably. Unlike the situation in *Community Health Services of Crawford,* where the private party was unable to demonstrate that it would be "significantly worse off" as a result of its reliance on the Government action, 104 S.Ct. at 2225, plaintiff's loss of status was not something that could be corrected at a later time as a result of his inability to satisfy the new statutory requirements.

Although the traditional elements of estoppel are present in this case, something in addition to these traditional elements must be shown in order to estop the Government. *Immigration and Naturalization Service v. Miranda,* 459 U.S. 14, 18, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982). In *Miranda,* the Ninth Circuit Court of Appeals held that the unexplained failure of INS to act on a visa petition for an eighteen month period amounted to affirmative misconduct. *Miranda v. Immigration and Naturalization Service,* 638 F.2d 83, 84 (9th Cir.1980). The Supreme Court stated that the "Court of Appeals thus correctly considered whether, as an initial matter, there was a showing of affirmative misconduct." *Miranda,* 459 U.S. at 17, 103 S.Ct. at 283. However, the Court rejected the Court of Appeals' conclusion that affirmative misconduct was actually established by the evidence: "Proof only that the Government failed to process promptly an application falls far short of establishing such conduct." 459 U.S. at 19, 103 S.Ct. at 284.

In the instant case, the INS's lengthy delay is accompanied by factors establishing both unwarranted delay and affirmative misconduct. On March 23, 1979, plaintiff delivered his § 13 application to the INS office in Kansas City coupled with the required birth certificates for each member of his family. On March 26, 1980, plaintiff was instructed by Form I–72 to obtain a medical examination and to deliver the results to the INS office in Kansas City. The same form that instructed plaintiff to furnish a medical examination also could have been used to request copies of birth certificates. Presumably, copies of birth certificates were not requested because plaintiff had delivered them to INS one year before. Over a year later, however, and over two years after the application was originally filed, plaintiff received the very same Form I–72 requesting that he furnish a birth certificate for each member of his family, a marriage certificate and a Summary Translation in English of Any Foreign Document. Therefore, over two years after plaintiff filed his application, the INS was asking plaintiff to resubmit information he had already furnished. Rather than acknowledge its responsibility for misplacing birth certificate information furnished by plaintiff, INS attempted to shift the blame to him by stating over two years after the application had been filed that plaintiff had never furnished the information. This type of behavior is not consistent with the minimum standard of decency, honor and reliability expected of Government. Under all the circumstances of this case, this was affirmative misconduct distinguishing this case from *Miranda.*

These very same facts also distinguish this case from *Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961) because in *Montana* all that was involved was erroneous advice given by a governmental official. Here, not only was there unwarranted delay, but the INS attempted to blame plaintiff for the INS's own deficiencies. For the same reason, *Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), is not controlling. There, the asserted basis for estoppel was the failure to publicize fully the rights afforded by Congress and failure to provide a naturalization representative in the Phillipines during the time the party was eligible for naturali-

zation. The Court did not believe that those failures could give rise to an estoppel. 414 U.S. at 8–9, 94 S.Ct. at 21–22.

Furthermore, this case does not involve estopping the Government from enforcing the conditions imposed by Congress for residency in this country. *See Miranda,* 459 U.S. 14, 103 S.Ct. 281. Plaintiff does not seek an order requiring the Government to grant him permanent resident status. Rather, plaintiff seeks only to estop the Government from applying to him the changes in § 1255b(b) enacted in December 1981, on the ground that those changes would not have been applicable to him had the Government processed his application properly.

Under the circumstances of this case, particularly that plaintiff does not seek from this Court the granting of a particular status, the public interest in ensuring that Government can enforce the law free from estoppel is outweighed by the interest of citizens in some minimum standard of decency, honor and reliability in their dealings with Government. Therefore, the defendants will be prohibited from applying to plaintiff the amendments to § 1255b(b) adopted by Congress in December 1981. The Attorney General of the United States will be ordered to consider plaintiff's § 13 application in accordance with § 13 of the Immigration and Nationality Act of September 11, 1957, as it existed in September 1981, with the exception of the Congressional veto provision in § 1255b(c) declared unconstitutional in *Chadha.*

Therefore, it is hereby ORDERED that the defendants are enjoined from adjudicating plaintiff's application for status as a permanent resident pursuant to the 1981 amendments to 8 U.S.C. § 1255b(b) and that the defendants shall adjudicate reasonably and fairly plaintiff's § 13 application pursuant to 8 U.S.C. § 1255b(b) as it existed in September 1981, provided, however, that defendants shall not submit the report to Congress required by 8 U.S.C. § 1255b(c).